**Leo HISE and Jack Isch, individually and as representatives of a class of others similarly situated, Plaintiffs,**

**v.**

**PHILIP MORRIS INC. (a Virginia Corp.), R.J. Reynolds Tobacco Co. (a New Jersey Corp.), Brown & Williamson Tobacco Corp. (a Delaware Corp.), Lorillard Tobacco Co. (a Delaware Corp.), and The Liggett Group d/b/a Liggett and Myers Tobacco Co. (a Delaware Corp.), Defendants.**

**No. 98–CV–947–C.**

United States District Court,
N.D. Oklahoma.

April 29, 1999.

[redacted]

WC Sellers, WC Sellers Inc, Sapulpa, OK, Jon D Sellers, Oklahoma City, OK, for Leo Hise and Jack Isch.

Ronald Lynn Walker, Keith Douglas Tracy, Mary E Nelson, Todd A Lard, McKinney Stringer & Webster, Oklahoma City, OK, Anna McLean, Curtis M Caton, Dana L Ballinger, Heller Ehrman White McAuliffe, San Francisco, CA, for Philip Morris Incorporated.

John Charles Niemeyer, Linda G Alexander, Anne E Zachritz, Niemeyer Alexander & Austin, Oklahoma City, OK, Paul S Ryerson, Robert F McDermott, Jr, Jones Day Reavis & Pogue, Washington, DC, for R.J. Reynolds Tobacco Company.

LeAnne Turner Burnett, Richard C Ford, Crowe & Dunlevy, Oklahoma City, OK, Victor Eric Morgan, Crowe & Dunlevy, Tulsa, OK, for Brown & Williamson Tobacco Corporation.

George W Dahnke, Abowitz, Rhodes & Dahnke PC, Oklahoma City, OK, J William Newbold, Michael B Minton, Carl L Rowley, Richard P Cassetta, Thompson Coburn, St Louis, MO, for Lorillard Tobacco Company.

Charles Michael Barkley, Barry Lynn Smith, Steven W Simcoe, Barkley Rodolf, Tulsa, OK, for Liggett Group Inc.

WC Sellers, WC Sellers Inc, Sapulpa, OK, Robert J Luddy, New York City, Jon D Sellers, Oklahoma City, OK, Alan R Wentzel, David S Levine, Lane & Mittendorf LLP, New York City, William M Wycoff, Kimberly A Brown, Stuart C Gaul, Jr, Thorp Reed & Armstrong, Pittsburgh, PA, for A.D. Bedell Wholesale Company, Inc., amicus.

1. Defendants, Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard filed their motion jointly, which defendant, Liggett, subsequently adopted in its separate motion.

2. The Court declines plaintiffs' invitation to treat the present action as a class action under Rule 23.

3. Plaintiffs represent in their response brief to defendants' present motions that the first

## ORDER

H. DALE COOK, District Judge.

Pending before the Court are the motions for summary judgment filed by defendants, pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

On December 15, 1998, plaintiffs filed the present action, purportedly on behalf of themselves and a class consisting of an estimated 40 million consumers of defendants' tobacco products, pursuant to Rule 23.[2] Plaintiffs allege in their Complaint that defendants have engaged in, and are currently engaging in, certain unlawful activities arising out of, and related to, defendants' performance of a settlement agreement which they entered into with more than 40 states, and plaintiffs allege that such unlawful activities have caused, and are currently causing, harm to them. Specifically, plaintiffs allege that, subsequent to entering into a settlement with the settling states, defendants have jointly, and unlawfully, agreed to raise tobacco prices in order to pay the costs of the settlement, in violation of federal antitrust laws.[3] Plaintiffs further allege that defendants' action in so raising tobacco prices amounts to a deprivation of plaintiffs' property interest without due process of law, in violation of plaintiffs' constitutional rights. Plaintiffs also allege that the parties to the settlement agreement have presumed to assume regulations and governance over the manufacture, interstate trade and consumption of tobacco products, presumably in violation of the Constitution.

Defendants have not answered plaintiffs' Complaint, but they filed motions to dis-

count of their Complaint alleges an unlawful collusion between the Attorneys General of the various settling states and defendants to fix prices of tobacco products. Plaintiffs allege that the settlement agreement is nothing more than a sham designed to assess damages or taxes against the consumers of tobacco products.

miss on February 1, 1999, and February 5. Because the Court was asked to consider materials outside the pleadings, the Court converted defendants' motions to dismiss into motions for summary judgment on March 17, and the Court gave defendants 15 days in which to supplement their motions. The Court additionally gave plaintiffs 15 days thereafter in which to supplement their response. The parties have filed their supplemental papers, and defendants' present motions are now ripe for ruling.

## Facts

The following material facts are undisputed.[4] At various times preceding the institution of the present action, more than 40 states, including Oklahoma, filed lawsuits against numerous tobacco companies and manufactures, including the defendants herein. The states filed the suits for the purposes of furthering their policies regarding public health and reducing underage consumption of tobacco products, and the states requested monetary, equitable and injunctive relief.[5] Desiring to avoid the enormous expense and delay inherent in such litigation, the states and tobacco companies agreed to enter into negotiations with the aim of settling their various disputes. Ultimately, the negotiations succeeded, and in November 1998, the tobacco producing and manufacturing defendants, including the defendants herein, entered into a Master Settlement Agreement (MSA) with the plaintiff states. The M.S.A. is designed to achieve for the settling states funding for the advancement of public health, the implementation of tobacco-related health measures, and funding for a national foundation dedicated to reducing underage consumption of tobacco products. The M.S.A. contains detailed formulas governing the timing and amounts payable by the tobacco companies to each of the settling states, and the implementation of the M.S.A. is to be overseen by the National Association of Attorneys General.

On November 23, 1998, the State of Oklahoma, through its Attorney General, agreed to the MSA, and on December 1, 1998, the District Court for Cleveland County entered a uniform Consent Decree and Final Judgment, approving the M.S.A. and dismissing Oklahoma's claims. The District Court specifically found that entering into the M.S.A. is in the best interests of the State of Oklahoma. The M.S.A. was attached to the Consent Decree and Final Judgment, and filed therewith.[6] Subsequent to entering into the MSA, defendants raised the price of their tobacco products, presumably to cover the costs of the settlement.

## Standard of Review

In considering a motion for summary judgment, the Court "has no real discretion in determining whether to grant summary judgment." *U.S. v. Gammache,* 713

---

**4.** These facts are cited in defendants' brief in support of their motion and in their exhibit accompanying their motion. Plaintiffs do not contest these facts.

**5.** The M.S.A. states that,

the Settling States that have commenced litigation have sought to obtain equitable relief and damages under state laws, including consumer protection and/or antitrust laws, in order to further the Settling States' policies regarding public health, including policies adopted to achieve a significant reduction in smoking by Youth.... Settling State officials believe that entry into this Agreement and uniform consent decrees with the tobacco industry is necessary in order to further the Settling States' policies

designed to reduce Youth smoking, to promote the public health and to secure monetary payments to the Settling States.

**6.** Plaintiffs, in their response brief, claim that the term "Master Settlement Agreement" is misleading, as the M.S.A. is merely an offer to settle pending claims for damages on an annual basis. However, because the settling states, including Oklahoma, specifically agreed to the M.S.A. and incorporated it into their Consent Decree and Final Judgments, which were then accepted and entered by the respective state courts in which the lawsuits were pending, the M.S.A. clearly constitutes the actual settlement agreement between the several settling states and the tobacco companies.

F.2d 588, 594 (10th Cir.1983). The Court must view the pleadings and documentary evidence in the light most favorable to the nonmovant, *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 527–28 (10th Cir.1994), and summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir.1998). "'[T]he moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment.'" *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991) (quoting *Ewing v. Amoco Oil Co.*, 823 F.2d 1432, 1437 (10th Cir.1987)). However, once the moving party meets its burden, the burden then shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The "party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

### Discussion

Upon a careful review of plaintiffs' Complaint, defendants' and plaintiffs' submissions in relation to defendants' motions for summary judgment, and the relevant law, the Court is convinced that defendants have shown, beyond a reasonable doubt, that they are entitled to summary judgment, even at this early stage in the proceedings. Because the Complaint and the allegations contained therein must fail as a matter of law, the Court sees no reason to burden defendants with the additional time and expense involved in proceeding to discovery.

With respect to plaintiffs' first claim, alleging a violation of Section 1 of the Sherman Anti–Trust Act, 15 U.S.C. § 1, the Court agrees with defendants that the *Noerr–Pennington* doctrine and the *Illinois Brick* indirect purchaser rule preclude recovery of damages here. The *Noerr–Pennington* doctrine, based on the Supreme Court's decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), holds generally that a private entity's right to petition the government, including the judiciary, is immune from federal antitrust claims, regardless of any anti-competitive intent or consequences, unless such conduct or action is a "sham." *See also City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379–380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) ("federal antitrust laws ... do not regulate the conduct of private individuals in seeking anticompetitive action from the government [and] *Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose"); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (the right to petition extends to all departments of the government, including the courts). "The 'sham' exception to *Noerr* encompasses situations in which persons use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon ..., [and a] 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all." *City of Columbia*, 499 U.S. at 380, 111 S.Ct. 1344 (citations omitted).

Defendants argue that, to the extent plaintiffs claim that defendants violated the antitrust laws by negotiating and

entering into the MSA, such activity is protected under the *Noerr–Pennington* doctrine as conduct incidental to litigation. Defendants assert that, subsequent to being sued by over 40 states in the respective state courts, they entered into the M.S.A. to compromise these lawsuits. Defendants contend that the M.S.A. represents defendants' joint defense of the state actions, and, once the M.S.A. was approved by the various states, the M.S.A. represents the product of defendants' petitioning of the settling states and the judiciary. Defendants further argue that the M.S.A. is protected as a contract with government officials. Defendants point to plaintiffs' concession that the M.S.A. was a compromise agreement reached between defendants and the several states that had initiated lawsuits against defendants. Defendants therefore maintain that both the negotiation phase and the resulting agreement with the states fall within the protections afforded by the *Noerr–Pennington* doctrine.

Plaintiffs counter that the *Noerr–Pennington* doctrine does not apply here because the M.S.A. amounts to a "tax" upon consumers of tobacco products, and plaintiffs list several reasons why they believe that the M.S.A. constitutes a tax. Plaintiffs further contend that the states lacked the authority to levy such a tax. Strikingly absent from plaintiffs' argument on this issue, however, is any citation to any authority whatsoever. In contrast to the abundance of authority supporting defendants' arguments, plaintiffs apparently cannot cite to any supporting their theory.[7] Plaintiffs additionally argue that the settling states and defendants lack the authority to assess and collect damages against plaintiffs. Plaintiffs base this claim on the fact that the M.S.A. assessment was intended to be collected from them in the form of higher prices on tobac-

co products. Again, however, plaintiffs cite to no supporting authority.[8]

The Court is satisfied that defendants' activities, in negotiating the M.S.A. with the several settling states and achieving a settlement agreement with those states, are protected under the *Noerr–Pennington* doctrine as conduct incidental to litigation. *See Lemelson v. Bendix Corp.*, 104 F.R.D. 13, 18 (D.De.1984) (defendants have a right to take joint legal action in response to a common problem, and their joint defense, standing alone, cannot provide any basis for antitrust liability). The Court agrees with defendants that the doctrine would surely ring hollow if it failed to encompass private entities who, after having been sued by one or more states for similar conduct, jointly petition the states in order to achieve a mutually acceptable settlement, designed to reduce the amount of time and expense involved in defending the action. Under the doctrine, the fact that the private defendants' motives are selfish is irrelevant, *City of Columbia*, 499 U.S. at 380, 111 S.Ct. 1344, and so too is the fact that the result may have anticompetitive consequences. *See Greenwood Utilities Comm'n v. Mississippi Power Co.*, 751 F.2d 1484, 1497 (5th Cir.1985) (The *Noerr–Pennington* doctrine "allows individuals or businesses to petition the government, free of the threat of antitrust liability, for action that may have anticompetitive consequences. *Noerr–Pennington* protection is grounded on the theory that the right to petition guaranteed by the First Amendment extends to petitions for selfish, even anticompetitive ends.").

The Court finds that the actions of defendants in negotiating and executing the M.S.A. fall within the recognition that "*Noerr* shields from the Sherman Act a concerted effort to influence public officials

---

7. At most, plaintiffs cite to the constitutions of the United States and Oklahoma. However, these citations do not address the issues presented herein, and they do not support plaintiffs' arguments.

8. Plaintiffs also contend that Due Process requires notice and an opportunity to be heard before one can be deprived of his property. The Court will address this argument below.

regardless of intent or purpose," *City of Columbia,* at 380, 111 S.Ct. 1344 (quoting *Pennington,* 381 U.S. at 670, 85 S.Ct. 1585), and the Court therefore concludes that the concerted effort by defendants to influence public officials, i.e., the states' Attorneys General, to accept a settlement in exchange for dismissing the numerous lawsuits pending against defendants is among the activities protected by the *Noerr–Pennington* doctrine. Further, although plaintiffs' Complaint labels the M.S.A. as a "sham", the Court finds no evidence which even remotely suggests that defendants intended to use the M.S.A. as an anti-competitive weapon to exclude or harass competitors.

Defendants additionally argue that, as indirect purchasers of tobacco products, plaintiffs do not have standing to assert a federal antitrust claim for damages. For this argument, defendants rely on the Supreme Court's decision in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), which held that,

> "indirect purchasers do not have standing to recover damages resulting from antitrust violations. The Court, reiterating the rationale of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), stated that the judicial procedures and economic theory required in claims tracing antitrust injuries from the producers to ultimate consumer were too complicated to warrant granting standing to indirect plaintiffs. *Illinois Brick,* 431 U.S. at 737–43, 97 S.Ct. 2061.... The Court implied that by limiting standing to direct purchasers, the Court hoped to insure aggressive and efficient enforcement of suits against antitrust violations. *Id.* at 745–47, 97 S.Ct.

2061." Emerson, *Voluntary Restraint Agreements and Democratic Decision-making,* 31 Va.J.Int'l.L. 281, n. 131 (1991).

*See also Sports Racing Services, Inc. v. Sports Car Club of America, Inc.,* 131 F.3d 874, 889 (10th Cir.1997) ("The *Illinois Brick* rule selects the better plaintiff between two possible types of plaintiffs— direct purchasers and indirect purchasers. The Court chose the direct purchaser primarily to simplify damages determinations and limit the possibility of multiple recovery against the defendant."). Defendants argue that, since plaintiffs do not allege that they are direct purchasers of defendants' tobacco products, they lack standing to recover damages here.[9]

Plaintiffs argue that *Illinois Brick* is inapplicable because this case "involves an industry-wide increase in cost by way of an excise." Plaintiffs contend that but for the assessment of the MSA, tobacco products would be sold at the present prices less the M.S.A. assessment. Plaintiffs also argue that the indirect purchaser rule does not apply to requests for injunctive relief.

 The Court agrees with the position taken by defendants. *Illinois Brick* and its progeny make clear that only direct purchasers, and no others in the chain of manufacture and distribution, have standing to bring an action for damages under the federal antitrust laws.[10] *See Kansas and Missouri v. UtiliCorp United, Inc.* 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) (reaffirming *Illinois Brick* direct purchaser rule). Plaintiffs' attempts to distinguish this case lack merit, and the Court concludes that, as indirect purchasers of tobacco products, *Illinois Brick* bars their claim for damages here.[11]

---

**9.** Defendants represent that they do not sell their tobacco products to ultimate consumers, such as plaintiffs, but only to distributors. Further, plaintiffs do not allege that they purchase tobacco products directly from defendants.

**10.** Certain limited exceptions to the direct purchaser rule have been recognized, none of which apply here. *In re Wyoming Tight Sands Antitrust Cases,* 866 F.2d 1286, 1290 (10th Cir.1989).

**11.** As the Court found and concluded above, Plaintiffs' claims for both damages and in-

Notwithstanding the above discussion, however, the Court recognizes that although plaintiffs' Complaint seems to be directed almost entirely at the MSA,[12] plaintiffs are essentially attacking the increase in prices of defendants' tobacco products which occurred after the execution of the MSA. While the Court has concluded that the negotiation and ultimate execution of the M.S.A. are protected activities under the *Noerr–Pennington* doctrine, this does not address the allegation that defendants conspired to set a price for their products following execution of the MSA. Of course, the Court does not believe that defendants were free at any time, either prior to or after execution of the MSA, to enter into a conspiracy to fix tobacco prices. *See SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 962 (10th Cir.1994) (Section 1 of the Sherman Act forbids agreements in restraint of trade, and price-fixing agreements, being devoid of redeeming competitive rationales, are per se illegal). However, construing plaintiffs' first claim as alleging a conspiracy to fix tobacco prices either during the negotiation phase of the M.S.A. or after the M.S.A. was executed, the Court concludes that the claim must fail.

■ First, *Illinois Brick*, supra, bars plaintiffs' claim for damages even if defendants did, in fact, conspire to fix prices following the execution of the MSA. Second, regarding plaintiffs' claim for injunctive relief, which defendants concede is not precluded by *Illinois Brick*, the Court agrees with defendants that plaintiffs failed to adequately plead a price-fixing conspiracy. Indeed, plaintiffs' Complaint contains the very type of bare bones allegation of a price-fixing conspiracy that the Tenth Circuit has held to be insufficient to state an antitrust claim.[13] *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026 (10th Cir.1992). Further, even construing plaintiffs' response to defendants' present motions as presenting additional factual allegations in support of their claim, plaintiffs allege, at most, and without any corroborating evidence, that defendants jointly determined, along with the various Attorneys General of the settling states, that the costs of the M.S.A. could be, and would be, passed along to the consumers,[14] and plaintiffs allege that defendants announced to their wholesalers and retailers prior to the execution of the M.S.A. that they would be increasing the prices of their tobacco products because of the settlement. However, no where do plaintiffs suggest that defendants actually conspired to fix tobacco at a certain price or price range. Nor is there any direct evidence that defendants jointly agreed that any or all of them would increase the prices of their respective tobacco products to cover the costs of the settlement.

■ Additionally, plaintiffs have not offered sufficient circumstantial evidence of an illegal agreement to survive defendants' summary judgment motions. Merely because defendants may have acknowledged amongst themselves their otherwise independent decisions to increase the price of their respective tobacco products by an indeterminate amount following execution of the M.S.A. to cover the costs of the settlement, and simply because defendants

junctive relief with respect to the negotiation and execution of the M.S.A. are barred by the *Noerr–Pennington* doctrine.

12. In their response brief to defendants' present motions, plaintiffs state that it is their "position ... that the terms of the [MSA] are unlawful and prohibited."

13. Plaintiffs merely allege in their Complaint that "Defendants have raised the prices of their tobacco products in order to pay the costs of the 'settlement agreement' contract which restrains trade. These price increases were made by the Defendants, each in collusion with the other in restraint of trade in violation of the anti-trust laws of the United States."

14. Defendants specifically represent to the Court that no provision in the M.S.A. required them to increase tobacco prices, and plaintiffs have not pointed to any such provision.

did, in fact, raise their prices to one degree or another following execution of the settlement,[15] it does not necessarily follow that defendants thereby violated § 1 of the Sherman Act. As the Court notes below, it makes perfect economic and business sense for manufacturers and producers, when assessed an enormous liability arising out of a harm caused by their products, to seek to pass along and spread the loss to the ultimate consumer by raising the prices of their products, and it would have indeed been a strange business decision for each defendant to not have increased the price of its tobacco products following execution of the MSA.

Plaintiffs have therefore shown, at most, that defendants entered into a uniform settlement with several states and subsequently raised the prices of their tobacco products. However, "[a]mbiguous conduct that is as consistent with permissible competition as with illegal conspiracy does not by itself support an inference of antitrust conspiracy under Sherman Act section 1." *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 63 F.3d 1540, 1556 (10th Cir.1995). While parallel behavior may contribute to a finding of antitrust conspiracy, it is insufficient, in and of itself, to prove a conspiracy. *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir.1989). It appears to the Court that defendants, in raising the prices of their respective tobacco products, acted independently of each other out of a legitimate and reasonable business interest of passing the costs of the settlement on to the ultimate consumer, and plaintiffs presented no evidence tending to exclude this possibility.[16] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (to sur-

vive a motion for summary judgment, a plaintiff alleging a violation of § 1 of the Sherman Act must present evidence that tends to exclude the possibility that the alleged conspirators acted independently).

Plaintiffs' second claim is that defendants' action in raising prices of tobacco products amounts to a deprivation of plaintiffs' property interest without due process of law, in violation of plaintiffs' constitutional rights. Plaintiffs specifically allege that they have been "deprived of a property interest without due process of law contrary to the due process mandate of the U.S. [Constitution] ..., because the 'damages' paid to States by Defendants under the 'settlement agreement' contract are being assessed against Plaintiffs without Plaintiffs being made parties to the actions previously filed in the separate States." The frivolity of this allegation is plain from its face, and plaintiffs support it with the citation to no relevant authority. By entering into the MSA, the settling states and defendants did not deprive plaintiffs of any property interest in violation of Due Process. Indeed, plaintiffs clearly have no recognized property interest in paying a certain sum to a retailer to purchase a tobacco product. Further, the "damages" allegedly assessed in the M.S.A. are not assessed against plaintiffs. The sums agreed to under the MSA, rather, are assessed against, and payable by, defendants. The fact that defendants intended to pass such losses on to the consumers of their products is simply a reality of business. When a particular manufacturer is found liable for creating a certain risk which harms a consumer, it is not at all odd for the manufacturer to seek to cover its losses by increasing the price of its product, thereby passing the loss on to the ultimate consumer. From the Court's experience, this is a common practice. If

---

**15.** Plaintiffs do not allege that each defendant raised the price of its tobacco products in an amount equal to that of every other defendant following execution of the MSA.

**16.** The Court agrees with defendants that "the most rational inference from [plaintiffs'] alleged facts is that the economic burdens imposed on each of the manufacturers under the M.S.A. caused or contributed to each defendant's independent decision to raise prices."

plaintiffs were to succeed here, then every time a manufacturer is held liable, or agrees to settle a dispute, and thereafter increases the price of its product in order to cover the damages it is required to pay, all consumers of its product could bring an action alleging a due process violation. The absurdity of such a result is plain. Since plaintiffs have no recognized or cognizable property interest in paying an expected amount for tobacco products, this claim must fail.[17]

In their third claim, plaintiffs allege that the parties to the settlement agreement have presumed to assume regulations and governance over the manufacture, interstate trade and consumption of tobacco products. This claim is presumably based on the United States Constitution, 'but the claim does not point to a violation of any specific law. In their response brief to defendants' present motions, however, plaintiffs attempt to clarify this claim. Citing Article I, § 10 of the Constitution, Plaintiffs allege that the parties to the M.S.A. formed an unlawful confederation, arguing that the parties created a de facto government by entering into and executing the MSA. Plaintiffs cite no authority for their extraordinary claim, and the Court finds and concludes that this claim is plainly frivolous.

Accordingly, the Court hereby GRANTS defendants' motions for summary judgment. All other pending motions filed in this case are hereby rendered MOOT by entry of this Order.[18]

---

**17.** The Court further notes that plaintiffs failed to adequately allege state action.

**18.** Plaintiffs' counsel, Bill Sellers, filed a motion and complaint on April 19, 1999, seeking to have all parties to the M.S.A. taken into custody by the United States Marshal Service and charged with fraud and conspiracy to steal money from the people, presumably consumers of tobacco products. This motion and complaint is utterly frivolous.