**A.D. BEDELL WHOLESALE COMPANY, INC., on behalf of itself and all others similarly situated, Plaintiffs,**

v.

**PHILIP MORRIS, INCORPORATED, et al., Defendants.**

No. Civ.A. 99–558.

United States District Court,
W.D. Pennsylvania.

March 22, 2000.

Kimberly A Brown, Thorp Reed & Armstrong, Pittsburgh, PA, Alan R Wentzel, Windels Marx Lane & Mittendorf, New York City, for plaintiffs.

Bernard D Marcus, Marcus & Shapira, Pittsburgh, PA, Jerome Chapman, Arnold & Potter, Washington, DC, Brian C Castello, Jones Day Reavis & Pogue, Pittsburgh, PA, Peter A Bellacosa, Kirkland & Ellis, New York City, Gen Office, Kemal Alexander Mericli, Pittsburgh, PA, for defendants.

## OPINION and ORDER OF COURT

AMBROSE, District Judge.

Pending before the Court is the Joint Motion of Defendants Philip Morris Incorporated ("Philip Morris"), R.J. Reynolds Tobacco Company ("R.J.Reynolds") and Brown & Williamson Tobacco Corp. ("B & W") (collectively "the Defendants") to Dismiss the Complaint filed against them by Plaintiff A.D. Bedell Wholesale Company, Inc. ("Plaintiff") pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff has brought a putative

class action against Defendants under § 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 7 of the Clayton Act, 15 U.S.C. § 18. The primary basis for the motion to dismiss is that "[a]s a matter of law, plaintiff's Complaint fails to state a claim for relief under the anti-trust laws" in that "plaintiff's claims are barred in their entirety by either (or both) of two closely-related antitrust immunity doctrines: the Noerr–Pennington doctrine and the 'state action' doctrine." Defendants' Joint Memorandum of Law in Support of Their Motion to Dismiss the Complaint ("Defendants' Supporting Brief"), p. 3. Additionally, Defendants argue that Plaintiff's Third Claim for Relief ("Count III"), which is brought only against Defendant Philip Morris, must be dismissed for failure to state a claim under § 7 of the Clayton Act upon which relief can be granted. An amici curiae Brief in Support of the Defendants' Motion to Dismiss has been filed by certain state Attorneys General, all members of the Tobacco Committee of the National Association of Attorneys General "to the extent that Plaintiff seeks to impose antitrust liability upon the Defendants for the entering into settlement agreements with the sovereign states, and acts taken in compliance with the terms of such settlement agreements. Brief of Amici Curiae State Attorneys General ("Amici Curiae Brief"), p. 5.

### STANDARD OF REVIEW

In deciding a motion to dismiss, all factual allegations and all reasonable inferences therefrom must be accepted as true and viewed in the light most favorable to the plaintiff. *Colburn v. Upper Darby Tp.*, 838 F.2d 663, 666 (3d Cir.1988), *cert. den'd,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989). A court may dismiss a plaintiff's complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In ruling on a motion to dismiss for failure to state a claim, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." *Colburn,* 838 F.2d at 666.

### FACTUAL BACKGROUND

In November, 1998, the Defendants entered into a settlement agreement (the "Master Settlement Agreement" or "MSA") with forty-six (46) states and six (6) other United States jurisdictions (collectively "the settling states") to settle lawsuits brought or threatened by the settling states for violation of their laws, including consumer protection and/or antitrust laws. MSA, Section ·1. Various officials of the settling states (the attorney generals, governors, corporation counsel and mayors) signed the Master Settlement Agreement "on behalf of their respective Settling States." *Id.* The Master Settlement Agreement was voluntarily entered into by each of the settling states and the Defendants and is the result of arms-length negotiations between the parties to the Agreement. The stated reason for the settling states entering into the M.S.A. § was because "the undersigned Settling State officials believe that entry of this Agreement ... with the tobacco industry is necessary in order to promote the Settling States' policies designed to reduce Youth smoking, to promote the public health and to secure monetary payments to the Settling States." MSA, Section 1.

Relevant for purposes of this action, the Master Settlement Agreement contains a clause, termed by Plaintiff in its Complaint as the Renegade Clause. The Renegade Clause states: "[a] Subsequent Participating Manufacturer ("SPM") shall have payment obligations under this Agreement only in the event that its Market Share in any calendar year exceeds the greater of (1) its 1998 market share or (2) 125% of its 1997 market share." The Master Settlement Agreement also provides for the creation of a $50 million fund by the Attor-

neys General of the United States, acting through the National Association of Attorneys General ("NAAG"), which is to be maintained by the Attorneys General to supplement the settling states' enforcement and implementation of the terms of the Master Settlement Agreement and consent decrees and investigation and litigation of potential violation of laws with respect to tobacco products.

### SUMMARY OF PLAINTIFF'S CLAIMS AGAINST THE DEFENDANTS

Count I of Plaintiff's Complaint alleges a violation of § 1 of the Sherman Act. More specifically, Count I of the Plaintiff's Complaint alleges that the Renegade Clause of the Master Settlement Agreement and the $50 million enforcement fund were made part of the Master Settlement Agreement by the Defendants as part of a conspiracy to prevent competition at a discount level by existing SPMs and nonparticipating manufacturers ("NPMs") and potential new entrants to the cigarette sales market and to raise and maintain the price of cigarettes in the U.S. cigarette market at artificially high levels. Thus, Plaintiff argues, the Master Settlement Agreement on its face sets forth a classic horizontal conspiracy to restrict output, allocate market shares and raise prices between three competitors having nearly 90% of the market. In Count I, Plaintiff also alleges that the acts committed by the Defendants in furtherance of their unlawful conspiracy included the payment by Philip Morris to Liggett, a tobacco manufacturer and then a NPM in the MSA, of $300 million for the sale of three relatively insignificant brands of cigarettes which was conditioned upon Liggett signing the Master Settlement Agreement and the pressuring by the Defendants, through their own attorneys and indirectly through the NAAG and its private attorneys, of the few remaining small competitors to join the Master Settlement Agreement.

Count II of Plaintiff's Complaint alleges a violation of § 2 of the Sherman Act.

More particularly, in Count II of the Complaint, Plaintiff alleges that the above-described alleged acts and agreements by the Defendants constitute a conspiracy in furtherance of Philip Morris' monopolization of the U.S. cigarette market in violation of § 2 of the Sherman Act in that the agreements and the acts taken in furtherance of the agreements were specifically intended to exclude and have in fact excluded meaningful price competition in the United States domestic cigarette market. Plaintiff further alleges in Count II that the acts of Philip Morris constitute monopolization and attempted monopolization of the U.S. cigarette market; that Philip Morris has and has had the specific intent to monopolize the U.S. cigarette market; and that there is a reasonable probability that it has or soon will have attained monopoly power in the U.S. cigarette market.

Count III of Plaintiff's Complaint alleges a violation of § 7 of the Clayton Act against Defendant Philip Morris only. More specifically, Plaintiff alleges that Philip Morris paid Liggett to join the Master Settlement Agreement to remove Liggett as a competitive threat. Specifically, Plaintiff alleges that on November 20, 1998, three (3) days after the Master Settlement Agreement was signed, Philip Morris purchased three brands of premium cigarettes from Liggett which constituted about two-thirds of the 2% of the overall domestic cigarette market that were sold by NPMs (or 0.2% of the domestic cigarette market) in exchange for Liggett's agreement to become a SPM in the MSA. Plaintiff further alleges that this acquisition would constitute a purchase of assets illegal under § 7 of the Clayton Act in that its effect may be, and has been, to substantially lessen competition and to further or create a monopoly in the sale of domestic cigarettes. Plaintiff argues that until that time Liggett was a NPM and although NPMs comprised only approximately 2% of the overall domestic cigarette market, they represented a clear and present danger of price competition. Lig-

gett sales made up about two-thirds of that 2% and therefore, Plaintiff argues, having Liggett join the Master Settlement Agreement was a necessary step to eliminating virtually all price competition with the domestic tobacco market.

## LEGAL ANALYSIS

### A. Counts I and II: Sherman Act claims.

1. Application of Noerr–Pennington immunity doctrine.

■ Defendants first argue that the claims asserted against them in Plaintiff's Complaint must be dismissed in their entirety in light of the Noerr–Pennington immunity doctrine because "the *Noerr–Pennington* doctrine also confers antitrust immunity upon litigation activities of competitors," "[l]itigation settlements with the government are indisputably within the scope of *Noerr–Pennington* immunity," "it is well-established that the *Noerr–Pennington* ... doctrine[is] applicable even if the alleged conduct would otherwise be deemed 'illegal per se' under the antitrust laws," and "the M.S.A. § was an agreement *with the government* (rather than a mere agreement with other *private* parties), [and therefore,] it would also be entitled to Noerr–Pennington protection as a government contract, even if it had not been executed to resolve pending and threatened litigation." Defendants' Supporting Brief, pp. 5–6, 8–10.

As explained by the United States Court of Appeals for the Third Circuit in *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir.), *cert. den'd*, —— U.S. ——, 120 S.Ct. 173, 145 L.Ed.2d 146 (1999):

[a] party who petitions the government for redress generally is immune from antitrust liability. This immunity extends to persons who petition all types of government entities—legislatures, administrative agencies, and courts. "[W]here restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out."

Noerr–Pennington does not apply, however to petitions or lawsuits that are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." Often, a petition to the government causes an anticompetitive effect, but "evidence of anticompetitive intent or purpose alone cannot transfer otherwise legitimate activity into a sham."

*Id.* at 122 (internal citations omitted). *See also City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) ("[t]he 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process* —as opposed to the *outcome* of that process—as an anticompetitive weapon. . . . A 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable governmental action' at all [citation omitted] not one 'who genuinely seeks to achieve his governmental result, but does so *through improper* means'."); *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 326 (3d Cir.1999) ("[t]he Noerr–Pennington doctrine originated in the anti-trust context as the proposition that 'joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act'.").

Relevant to the case *sub judice* is the decision of the United States District Court for the Northern District of Oklahoma in *Hise v. Philip Morris Inc.*, 46 F.Supp.2d 1201 (N.D.Ok.1999), *aff'd*, 2000 WL 192892 (10th Cir. Feb.17, 2000). *Hise* involved the very same defendants as in the case at bar and involved claims by the plaintiffs, consumers of the defendants' tobacco products, that the defendants had violated federal antitrust laws by negotiating and entering into the MSA. Defen-

dants argue that said activity was protected under the Noerr–Pennington doctrine as conduct incidental to litigation and as a contract entered into with the government:

Defendants assert that subsequent to being sued by over 40 states in the respective state courts, they entered into the M.S.A. to compromise these lawsuits. Defendants contend that the M.S.A. represents defendants' petitioning of the settling states and the judiciary. Defendants further argue that the M.S.A. is protected as a contract with government officials. Defendants point to plaintiffs' concession that the M.S.A. was a compromise agreement reached between defendants and the several states that had initiated lawsuits against defendants. Defendants therefore maintain that both the negotiation phase and the resulting agreement with the states fall within the protections afforded by the Noerr–Pennington doctrine.

*Id.* at 1205–06. Ultimately, the *Hise* district court concluded that the defendants' activities "in negotiating the M.S.A with the settling states and achieving a settlement agreement with those states are protected under the Noerr–Pennington doctrine as conduct incidental to litigation." *Id.* at 1206. *See also id.* at 1207 ("[t]he Court finds that the actions of defendants in negotiating and executing the M.S.A. fall within the recognition that 'Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose' . . . and therefore concludes that the concerted effort by defendants to influence public officials, i.e., the states' Attorney General, to accept a settlement in exchange for dismissing the numerous lawsuits pending against defendants is among the activities protected by the Noerr–Pennington doctrine."). In so holding, the court reasoned "[t]he Court agrees with defendants that the doctrine would surely ring hollow if it failed to encompass private entities who, after having been sued by one or more states for similar conduct, jointly petition the states in order to achieve a mutually acceptable settlement, designed to reduce the amount of time and expense involved in defending the action." *Id.* Moreover, the *Hise* court explained that under the Noerr–Pennington doctrine, "the fact that the private defendants' motives are selfish is irrelevant" as is "the fact that the result may have anti-competitive consequences." *Id.*, citing, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991); *Greenwood Utilities Com'n v. Mississippi Power Co.*, 751 F.2d 1484, 1497 (5th Cir.1985). Significantly, the district court's decision in *Hise* was recently affirmed by the United States Court of Appeals in *Hise v. Philip Morris Inc.*, 2000 WL 192892 (10th Cir. Feb.17, 2000). In the appellate decision, the court first explained: "the district court rejected [the plaintiffs'] first claim that the settlement agreement violates the Sherman Anti–Trust Act" and "[i]n so holding, the district court determined the tobacco companies' action in negotiating and executing the settlement agreement fell under the protections of the 'Noerr–Pennington' doctrine which shields from the Sherman Anti–Trust Act any concerted effort to influence public officials, regardless or intent or purpose." *Id.* The appellate court then stated that "we must agree with the district court that summary judgment should be granted in favor of the tobacco companies," that "[b]ecause the district court issued a well-reasoned decision, thoroughly explaining the reasons for granting summary judgment . . . we decline to duplicate its analysis here," and ultimately concluded "[f]or the reasons contained herein, and for substantially the same reasons articulated in the district court's April 29, 1999 decision, we AFFIRM summary judgment in favor of the Appellee tobacco companies".[1] *Id.*

After careful consideration of the submissions of the parties, as did the *Hise*

---

1. Notably, the appellate court also explained that the plaintiff in the case *sub judice,* A.D. Bedell Wholesale Company Inc., had filed an amicus curiae brief with the appellate court claiming that the district court had "sweepingly applied the 'Noerr–Pennington doctrine'

courts, I conclude that to the extent Plaintiff's antitrust claims are based upon the Defendants' actions in negotiating and executing the MSA, said actions fall within the category of conduct protected by the Noerr–Pennington immunity doctrine and are not subject to the "sham" exception to the Noerr–Pennington immunity doctrine. Accordingly, to the extent Plaintiff's antitrust claims found in Counts I and II of the Complaint are based upon the Defendants' actions in negotiating and executing the MSA, these claims are dismissed for failure to state a Sherman Act claim upon which relief can be granted.

### 2. Application of Parker State Action immunity doctrine.

■ Defendants contend that all of the antitrust claims against them must be dismissed because they are immune with respect to these actions under the state action immunity doctrine. In articulating the state action immunity doctrine, the United States Court of Appeals for the Third Circuit explained: "[i]n *Parker v. Brown* the Supreme Court held that the Sherman Act does not prohibit an anticompetitive restraint imposed by a state as an act of government." *Massachusetts School of Law at Andover, Inc. v. American Bar Assoc.,* 107 F.3d 1026, 1035 (3d Cir.1997), *cert. den'd,* 522 U.S. 907, 118 S.Ct. 264, 139 L.Ed.2d 191 (1997).

■ To the extent the Plaintiff's Complaint is premised upon it being injured by the Defendants' conduct of entering into, executing and implementing the Master Settlement Agreement and in engaging in conduct mandated under the terms of the Master Settlement, I conclude that the first step in determining whether the state action immunity doctrine is applicable to said conduct must be to determine whether the same conduct by the settling states,

i.e. in entering into, executing, and implementing the MSA, would be subject to state action immunity. Under the facts of this case, this conduct was action taken both by the Defendants and by the settling states and was mandated by the terms of the MSA.

After careful consideration of the submissions of the parties and the *amici curiae,* I conclude that because the conduct of entering into, executing and implementing the M.S.A. § was undertaken by the settling states functioning in their sovereign capacities, to the extent Plaintiff's injuries are premised upon said conduct, liability for said conduct by the states would be subject to *Parker* state action immunity. Obviously in so holding, I opine, contrary to the argument presented by Plaintiff, that in this case, application of the *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) test is inappropriate. *See Massachusetts School of Law at Andover, Inc.,* 107 F.3d at 1035 ("[b]ecause the states are sovereign in imposing the bar admission requirements, the clear articulation and active supervision requirements urged by [plaintiff] are inapplicable.").

Having so determined, I further conclude that to the extent Plaintiff alleges that its injuries were caused by the Defendants entering into, implementing and executing the Master Settlement Agreement with the settling states and in engaging in conduct mandated under the terms of the Master Settlement Agreement, said conduct similarly is protected under the state action immunity doctrine. To allow otherwise "would allow the Parker doctrine to be circumvented by artful pleading: 'A plaintiff could frustrate any [Parker protected state plan] merely by filing suit against the regulated private parties, rath-

without the necessary 'closer examination of the terms of the [settlement agreement] itself and the circumstances pursuant' thereto" and that both the tobacco defendants and A.D. Bedell had subsequently filed motions with accompanying briefs with respect to the amicus brief, that the court was denying both

motions because supplemental responses were not necessary, but that "in doing so, we note we have reviewed the responsive briefs, and conclude that even if considered, they would not affect our disposition in this case." *Id.* at n. 3.

er than the state officials who implement the plan'." *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869, 878 (9th Cir.1987), *quoting, Southern Motor Carriers Rate Conference, Inc. v. U.S.*, 471 U.S. 48, 105 S.Ct. 1721, 1727, 85 L.Ed.2d 36 (1985). *See also Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.*, 155 F.2d 59, 74 (2nd Cir.1998) (holding that once it was determined that state immunity protected state solid waste authority from liability under Sherman Act with respect to settlement agreement it entered into with private party defendants, private defendants were also protected under state action doctrine: "our conclusion that [the state entity] can avail itself of the Parker doctrine also compels the conclusion that the [private party] defendants are shielded from antitrust liability. Subjecting them to antitrust liability would effectively block [the state entity's] efforts to carry out its mandate through contracts with private parties"); *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital*, 185 F.3d 154, 159 (3d Cir.1999) (noting, in discussing the *Noerr–Pennington* doctrine, "if relief is sought solely for injury as to which the state would enjoy immunity under *Parker*, the private petitioner also enjoys immunity."). Thus, to the extent Plaintiff's Sherman Act anti-trust claims against Defendants, found in Counts I and II of the Complaint, are premised upon the Defendants entering into, implementing and executing the Master Settlement Agreement with the settling states and engaging in conduct mandated under the terms of the Master Settlement Agreement, these claims must be dismissed for failure to state a claim upon which relief can be granted.

3. Plaintiff's Sherman Act claims with respect to Philip Morris' conduct towards Liggett and Defendants' conduct towards other manufacturers of domestic cigarettes.

■ It must be emphasized that the analyses and holdings of this Court thus far have been limited to the injuries alleg-edly sustained by Plaintiff as a result of the Defendants' conduct in negotiating, entering into, implementing and executing the Master Settlement Agreement with the settling states and in engaging in conduct mandated under the terms of the Master Settlement Agreement. My analyses and holdings have not addressed the Plaintiff's allegations of violation of the Sherman Act with respect to Philip Morris buying three brands of cigarettes from Liggett in order to coerce its signing the Master Settlement Agreement or the conduct of the Defendants in coercing smaller manufacturers of domestic cigarettes to sign the MSA.

Defendants do, however, attack the viability of these allegations while discussing the applicability of the state action immunity doctrine to the allegations of the case at bar. *See* Defendants' Supporting Brief, p. 16.

After careful consideration of the submissions of the parties on this issue, I find that the state action immunity doctrine is applicable to the Plaintiff's claims that Defendants violated the Sherman Act in this regard. Specifically, I find that because the injury allegedly suffered by Plaintiffs as a result of the Defendants' alleged acts of coercion is an incidental effect of the conduct of the Defendants and the settling states in entering into, executing and implementing the MSA, conduct which I have held to be immune under the state action immunity doctrine, the state action immunity doctrine also applies to bar Plaintiff's anti-trust claims based upon said coercive acts. *See Massachusetts School of Law at Andover, Inc.*, 107 F.3d at 1035.

4. Summary.

For the above-stated reasons, Counts I and II of Plaintiff's Complaint are dismissed in their entirety.

B. *Count III—Plaintiff's § 7 Clayton Act claim against Defendant Philip Morris.*

■ In Count III of the Complaint, brought only against Defendant Philip

Morris, Plaintiff alleges a violation of § 7 of the Clayton Act. The allegations underlying this claim have been set forth *supra.*, and need not be repeated. Defendant Philip Morris moves to dismiss this claim against it on several bases. First, Philip Morris argues that this claim is only another antitrust challenge to the legality of the MSA, that Plaintiff alleges that because the M.S.A. § is unlawful, it was also unlawful for Phillip Morris to acquire the Liggett brands in order to induce Liggett to join the M.S.A. § which is necessarily premised upon the alleged illegality of the MSA. Therefore, Philip Morris contends that the claim should be dismissed on the same immunity grounds as the rest of the Complaint. Second, Philip Morris contends that Plaintiff's alleged injury from the acquisition by Philip Morris of the Liggett brands does not constitute an antitrust injury because "[a] plaintiff suffers 'antitrust injury' from an acquisition only if its injury is caused by the increase in market power that the acquired assets confer upon the acquiring firm." Defendants' Supporting Brief, p. 23. In the case at bar, Philip Morris argues that "[b]ecause plaintiff concedes that the brands acquired by Philip Morris are 'insignificant,' the acquisition of these brands, as a matter of law, could not increase Philip Morris' market power and thus could not cause 'antitrust injury' to plaintiff." *Id.* Third, Philip Morris argues that while Plaintiff alleges that it was injured by Liggett's decision to join the MSA, under *Alberta Gas Chemicals Ltd. v. E.I. Du Pont De Nemours and Co.,* 826 F.2d 1235, 1241 (3d Cir.1987), *cert. den'd,* 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988), such an allegation does not constitute "antitrust injury" resulting from an asset acquisition. Fourth, Philip Morris argues that to the extent Plaintiff is alleging that this acquisition is unlawful without regard to the MSA, § 7 of the Clayton Act only prohibits acquisitions that are likely "substantially to lessen competition," "[a]n acquisition cannot cause substantial injury to competition if it does not result in a

'significant' increase in the acquiring firm's market share." *Id.* Here Plaintiff alleges that the three brands purchased by Philip Morris are "insignificant" and together account for only 0.2% of cigarette sales in the United States, a *de minimis* amount. "Because plaintiff's own allegations confirm that Philip Morris' acquisition of the three brands acquired from Liggett cannot have a *significant* competitive impact, the Complaint fails to state a claim for relief under Clayton Act § 7." *Id.* at 24. Finally, in Defendants' Joint Reply Brief in Further Support of Their Motion to Dismiss the Complaint ("Defendants' Reply Brief"), Philip Morris argues that an acquisition is unlawful only if it will substantially harm competition, that the only allegation in Plaintiff's Complaint as to how the acquisition of the Liggett brands impairs competition is the allegation that the acquisition induced Liggett to join the MSA, and that because this allegation obviously depends upon a finding that the M.S.A. § itself is unlawful, the Clayton Act claim must be dismissed if the M.S.A. § is entitled to antitrust immunity. Defendants' Reply Brief, p. 10.

In response, Plaintiff argues that Philip Morris misstates its Clayton Act claim when it contends that said claim is "simply another antitrust challenge to the legality of the MSA" or that its injury arises from Liggett's decision to join the MSA. Plaintiff's Opposition Brief, p. 21, *citing* Defendants' Supporting Brief, p. 22. "While Liggett's execution of the M.S.A. § contributed to further concentration in the market, it was Philip Morris' acquisition—not Liggett's decision to join the MSA—is what violates § 7; and plaintiff, as a direct purchaser in the market where such acquisition may substantially lessen competition or tend to create a monopoly in Philip Morris, unequivocally has standing to sue for injunctive relief." *Id.* Plaintiff also argues that "[a]n antitrust plaintiff seeking injunctive relief for violation of § 7 need only show a threatened injury, not an actual one." *Id.* Plaintiff further argues that

its injury flows from the fact that it is a purchaser and reseller of cigarettes and Philip Morris now controls the supply of cigarettes. Therefore, Plaintiff argues, it is thus forced to operate in a market controlled by a monopolist rather than market forces. *Id.* Third, Plaintiff argues that Philip Morris' *de minimis* argument is not applicable here because in the case at bar there exists a highly concentrated market with significant barriers to entry and therefore, "even the slightest gain in market share via an acquisition violates § 7." *Id.* at 22.

■ After careful consideration of the submissions of the parties, I find as follows. First, given that Plaintiff's Clayton Act claim against Philip Morris is not premised upon Liggett's involvement in the Master Settlement Agreement, but rather, is based upon Philip Morris' acquisition of the Liggett brands allegedly to substantially lessen competition and to further or create a monopoly in the sale of domestic cigarettes, neither the Noerr–Pennington nor the Parker state action immunity doctrines are applicable. Further, I find that because Plaintiff's Clayton Act claim against Philip Morris is based upon Philip Morris' acquisition of the Liggett brands allegedly to substantially lessen competition and to further or create a monopoly in the sale of domestic cigarettes, it is not necessary to substantively address those arguments raised by Philip Morris that are premised upon Plaintiff's Clayton Act claim being based upon Liggett's involvement in the Master Settlement Agreement.

Finally, I find that because a claim for relief should only be dismissed at the motion to dismiss stage if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims which would entitle it to relief, it would be improper to dismiss Count III of Plaintiff's Complaint for failure to state a claim upon which relief can be granted. This is so because Plaintiff has alleged that Philip Morris' acquisition may be and has been to sub- stantially lessen competition in the domestic cigarette market, and to further or create a monopoly in the sale of domestic cigarettes. Complaint, ¶ 104. Additionally, Plaintiff has alleged that Defendants collectively account for 89% of all cigarettes sold in the domestic cigarette market, Philip Morris has a 52% total market share in the market and sells more than 60% of premium brand cigarettes, and barriers to entry in the U.S. market for cigarettes are substantial. *Id.* at ¶¶ 3 and 24. *See U.S. v. Aluminum Co. of America,* 377 U.S. 271, 278, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964) (holding that acquisition by Alcoa of stock and assets of another company violated § 7 of the Clayton Act where Alcoa had controlled from 27.8% to 32.5% of the aluminum conductor market, acquisition added 1.3% to Alcoa's control of the market and market was highly concentrated); *F.T.C. v. PepsiCo, Inc.,* 477 F.2d 24, 27 (2d Cir.1973) (holding in context of action for preliminary injunction that acquisition by PepsiCo of stock of another company likely violated § 7 of Clayton Act and Section 5 of the Federal Trade Commission Act where, *inter alia,* PepsiCo occupied 16.3% of soft drink concentrates market, PepsiCo and Coca Cola combined to control 58.3% of market, the top four companies accounted for 70.6% of market and soft drink business was not easily entered and acquisition would give PepsiCo another 1% of the soft drink non-cola market and .3% of the soft drink market); *Stanley Works v. F.T.C.,* 469 F.2d 498, 507–08 (2d Cir.1972), *cert. den'd,* 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1973) (holding that company with 1% of market's acquisition of another company with 22%–24% market share was a violation of § 7 of the Clayton Act and not *de minimis* where four companies dominated 50% of the market). Accordingly, Defendants' Motion to Dismiss Plaintiff's claim against Philip Morris for violation of § 7 of the Clayton Act is denied.

### *ORDER OF COURT*

**AND NOW,** this **22nd** day of March, 2000, after careful consideration of the

submissions of the parties and for the reasons stated in the Opinion accompanying this Order, it is **ORDERED** that the Defendants' Motion to Dismiss (Docket No. 15) is **GRANTED** as to Counts I and II of the Plaintiff's Complaint and is **DENIED** as to Count III of the Plaintiff's Complaint.

Defendants are **ORDERED** to file an Answer to Count III by **April 24, 2000.** A Status Conference is scheduled for **Tuesday, April 25, 2000** at **9:00 A.M.** before the undersigned in Room 620 of the United States Post Office and Courthouse. Counsel shall have settlement authority.