

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-19-2001

# A D Bedell Wholesale v. Philip Morris Inc

Precedential or Non-Precedential:

Docket 00-3410

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"A D Bedell Wholesale v. Philip Morris Inc" (2001). *2001 Decisions.* Paper 133.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/133

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 00-3410
_____


A.D. BEDELL WHOLESALE COMPANY, INC.;
TRIANGLE CANDY & TOBACCO CO., on behalf of
themselves and all others similarly situated,

Appellants

v.

PHILIP MORRIS INCORPORATED;
R.J. REYNOLDS TOBACCO COMPANY, INC.;
BROWN AND WILLIAMSON TOBACCO CORP.

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. Civil Action No. 99-cv-00558
(Honorable Donetta W. Ambrose)
_____


Argued December 14, 2000

Before: SCIRICA, FUENTES and GARTH, Circuit Judges

(Filed: June 19, 2001)

DAVID F. DOBBINS, ESQUIRE (ARGUED)
Patterson, Belknap, Webb & Tyler
1133 Avenue of the Americas
New York, New York 10036

WILLIAM M. WYCOFF, ESQUIRE
Thorp, Reed & Armstrong
One Oxford Centre
301 Grant Street
Pittsburgh, Pennsylvania 15219

ALAN R. WENTZEL, ESQUIRE
Windels, Marx, Lane & Mittendorf
156 West 56th Street
New York, New York 10019

    Attorneys for Appellants


DOUGLAS L. WALD, ESQUIRE (ARGUED)
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004

BERNARD D. MARCUS, ESQUIRE
Marcus & Shapira
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, Pennsylvania 15219

    Attorneys for Appellee,
    Philip Morris Incorporated

GREGORY G. KATSAS, ESQUIRE (ARGUED)
Jones, Day, Reavis & Pogue
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

JOHN E. IOLE, ESQUIRE
Jones, Day, Reavis & Pogue
500 Grant Street, 31st Floor
Pittsburgh, Pennsylvania 15219

  Attorneys for Appellee,
  R.J. Reynolds Tobacco Company, Inc.


TIMOTHY P. RYAN, ESQUIRE
Eckert, Seamans, Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219

  Attorney for Appellee,
  Brown and Williamson Tobacco Corp.


ERIK S. JAFFE, ESQUIRE (ARGUED)
5101 34th Street, N.W.
Washington, D.C. 20008

THOMAS C. O'BRIEN, ESQUIRE
36 West 5th Street
Corning, New York 14830

  Attorneys for Amici Curiae-Appellants,
  The Cato Institute, The Competitive Enterprise Institute,
  and The National Smokers Alliance

JOEL M. RESSLER, ESQUIRE
Office of Attorney General of Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, Pennsylvania 17120

     Attorney for Amici Curiae-Appellees,
     Attorneys General of Pennsylvania, California, Alaska,
     American Samoa, Arizona, Arkansas, Colorado, Connecticut,
     Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas,
     Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan,
     Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada,
     New Hampshire, New Jersey, New Mexico, New York, North Carolina,
     North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina,
     South Dakota, Tennessee, Utah, Vermont, Virginia, Washington,
     West Virginia, and Wyoming

---

OPINION OF THE COURT

---

SCIRICA, Circuit Judge.

This is an appeal from the dismissal under Fed. R. Civ. P. 12(b)(6) of claims brought under the Sherman Antitrust Act attacking the multi-billion dollar national tobacco settlement. Endeavoring to recoup billions of dollars in public health care costs and to reduce cigarette smoking, several states brought suit against the leading United States tobacco manufacturers. In view of the magnitude of potential liability and the prospect of multiple actions, the parties asked Congress to resolve the suits through a national legislative remedy. After congressional efforts stalled, forty-six states forged a settlement with the tobacco manufacturers known as the Multistate Settlement Agreement. Plaintiffs, who are cigarette wholesalers, challenge the Multistate Settlement Agreement as a violation of 1 and 2 of the Sherman Antitrust Act.

The District Court held that plaintiffs failed to state a claim under the Sherman Act because the tobacco companies were immune from antitrust liability under both the Noerr-Pennington and Parker immunity doctrines. We agree they are immune under the Noerr-Pennington doctrine but not under the Parker doctrine. We will affirm.

                              I.
                    Facts and Procedural History
     A.D. Bedell, a cigarette wholesaler, brought this class action on behalf of itself and 900 similarly situated wholesalers seeking damages and a permanent injunction of the Multistate Settlement Agreement.  Defendants, Philip Morris, Inc., R.J. Reynolds Tobacco Co., Inc., and Brown & Williamson Tobacco Corp., are cigarette manufacturers who were original signatories to the Multistate Settlement Agreement.  Along with Lorillard Tobacco Co., the fourth largest cigarette producer, they are collectively known as the major tobacco companies or the Majors.  The Majors are responsible for 98% of cigarette sales in the United States.  Bedell, as a wholesaler, bought directly from the Majors.

     In the mid 1990's, individual states commenced bringing law suits against the Majors to recoup healthcare costs and reduce smoking by minors.  As one state Attorney General declared, "'[The] lawsuit is premised on a simple notion: you caused the health crisis; you pay for it.'"  Janofsky, Mississippi Seeks Damages from Tobacco Companies, N.Y. Times, May 24, 1994, at A12 (quoting Mississippi Attorney General Mike Moore).  The States alleged a wide range of deceptive and fraudulent practices by the tobacco companies over decades of sales.  Faced with the prospect of defending multiple actions nationwide, the Majors sought a congressional remedy, primarily in the form of a national legislative settlement.  In June 1997, the National Association of Attorneys General and the Majors jointly petitioned Congress for a global resolution.

     The proposed congressional remedy (1997 National Settlement Proposal) for the cigarette tobacco problem resembled the eventual Multistate Settlement Agreement, but with important differences.  For example, although the congressional proposal would have earmarked 1/3 of all funds to combat teenage smoking, no such restrictions appear in the Multistate Settlement Agreement.  1997 National Settlement Proposal, Title VII, available at http://www.cnn.com/us/9705/tobacco/docs/proposal.html (last visited June 18, 2001).  In addition, the congressional proposal would have mandated Food & Drug

Administration oversight and imposed federal advertising restrictions.  It also would have granted immunity from state prosecutions; eliminated punitive damages in individual tort suits; and prohibited the use of class actions, or other joinder or aggregation devices without the defendant's consent, assuring that only individual actions could be brought.  See id. at Title V(A), VIII(A), VIII(B).  The congressional proposal called for payments to the States of $368.5 billion over twenty-five years.  1997 National Settlement Proposal, Title VI.  By contrast, assuming that the Majors would maintain their market share, the Multistate Settlement Agreement provides baseline payments of about $200 billion over twenty-five years.  See Multistate Settlement Agreement,    IX(a), (b), (c).

Significantly for our purposes, the congressional proposal included an explicit exemption from the federal antitrust laws.  See 1997 National Settlement Proposal, App. IV(C)(2) (stating cigarette manufacturers would have been permitted to "jointly confer, coordinate or act in concert, for this limited purpose [of achieving the goals of the settlement]").  The Multistate Settlement Agreement contains no corresponding exemption from the federal antitrust laws.

Congress rejected the proposed settlement in the spring of 1998.  Undeterred, the State Attorneys General and the Majors continued to negotiate and on November 23, 1998, they executed the Multistate Settlement Agreement.  Afterwards, twenty other tobacco manufacturers, representing 2% of the market, joined the settlement as Subsequent Participating Manufacturers (SPMs).  The addition of the Subsequent Participating Manufacturers meant that nearly all of the cigarette producers in the domestic market had signed the Multistate Settlement Agreement.  Their addition was significant.  The Majors allegedly feared that any cigarette manufacturer left out of a settlement (Non-Participating Manufacturers or NPMs) would be free to expand market share or could enter the market with lower prices, drastically altering the Majors' future profits and their ability to increase prices to pay for the settlement.

Plaintiffs brought suit challenging sections of the Multistate Settlement

Agreement allegedly designed to maintain market share and restrict entry. The challenged sections of the Multistate Settlement Agreement are the so-called "Renegade Clause," the settlement's primary mechanism for allocating payment responsibilities based on production levels, and the provision calling for "Qualifying Statutes," which are state laws passed as a result of commitments made in the Multistate Settlement Agreement that require Non-Participating Manufacturers to pay into state escrow accounts for each sale made. Plaintiffs claim the Multistate Settlement Agreement and resulting state implementing statutes create an output cartel that imposes draconian monetary penalties for increasing cigarette production beyond 1998 levels and effectively bars new entry into the cigarette market.

The Renegade Clause allegedly was designed to prevent current cigarette manufacturers from decreasing prices to increase market share and to bar new entrants from the market. One part of the Renegade Clause affects tobacco companies (SPMs) that later join the Multistate Settlement Agreement. This section creates strong disincentives for Subsequent Participating Manufacturers to increase their production and market share. If a Subsequent Participating Manufacturer exceeds its 1998 market share (or exceeds 125% of 1997 market share if that is greater), then it must pay into the settlement fund. By maintaining historic market share, it would owe nothing to the settlement fund. For every carton of cigarettes sold in 1999 over its 1998 level, a SPM would have to pay $.19/pack into the settlement fund. Plaintiffs contend this equaled 75% of the wholesale price, which defendants do not contest. See Br. of Appellants at 14 (applying MSA IX(C)); MSA Ex. E. This mechanism allegedly discourages Subsequent Participating Manufacturers from underpricing the Majors to increase market share, even if they could efficiently do so.

Another part of the Renegade Clause affects Non-Participating Manufacturers (NPMs), cigarette companies that never sign the Multistate Settlement Agreement. Non-Participating Manufacturers include potential new entrants into the tobacco market. See MSA IX(d). But as noted, between the SPMs and the Majors, about 99% of the current

cigarette producers signed the Multistate Settlement Agreement.  The strictures of the
Multistate Settlement Agreement affecting NPMs were largely responsible for such
participation.  Potential new entrants into the cigarette market would bear the burden of
the Renegade Clause's future effects.

Under the Renegade Clause, if Non-Participating Manufacturers gain market
share (thereby reducing the Majors' market share) the Majors may decrease their
principal payments to the settlement fund.  If the Majors lose market share to NPMs, the
payments to the settlement fund are not merely reduced proportionately.  See MSA
IX(d)(1)(A) & (B).  For example, if a participating tobacco company lost 10% of its
market share to a new entrant or other company that did not sign the Multistate
Settlement Agreement, it may be able to reduce its payments by as much as 24%.  See
Hanoch Dagan & James J. White, Governments, Citizens, and Injurious Industries, 75
N.Y.U. L. Rev. 354, 381 (2000) (making hypothetical calculations based on the formulas
in MSA  IX(d)).

By enacting the Qualifying Statute set forth in the Multistate Settlement
Agreement, see MSA Ex. T, a state can preclude reduced payments.  The model statute
provides,

> Any tobacco product manufacturer selling cigarettes to consumers within the State . . . after the date of enactment of this Act shall do one of following:
>
> (a) become a participating manufacturer (as that term is defined in section II(jj) of the Master Settlement Agreement) and generally perform its financial obligations under the Master Settlement Agreement; or
>
> (b) (1) place into a qualified escrow fund . . . the following amounts
>
> . . . .

Id.

The model Qualifying Statute would impose a tax on new tobacco entrants of approximately $.27/pack in the year 2001, rising to $.36/pack by the year 2007. See MSA Ex. T. A Non-Participating Manufacturer only can recover its deposited funds: (1) if it is forced to pay a judgment or settlement in connection with a claim brought by the state, or (2) after the passage of twenty years free from any such judgments. See id. Because the Non-Participating Manufacturers are not part of the settlement, they have no immunity and would be subject to similar suits brought by the State Attorneys General against the Majors (for fraudulent concealment, misrepresentation, conspiracy, etc.). To encourage and assist the States in bringing these suits, the Multistate Settlement Agreement created a $50 million Enforcement Fund (paid for by the Majors) to investigate and sue NPMs to enforce the settlement. See MSA VIII(c). Because of the Qualifying Statutes, a Non-Participating Manufacturer must decide either to join the Multistate Settlement Agreement and abide by the same restrictions on market share facing a SPM (which for new manufacturers would be costly because they would have a baseline production level of zero), or face litigation and pay a tax into a state established escrow account for any potential adverse judgments.

Together, the Renegade Clause, the Qualifying Statutes and the Enforcement Fund allegedly create severe obstacles to market entry, or to increasing production and market share. This is not accidental. The Multistate Settlement Agreement explicitly

proclaims its purpose to reduce the ability of non-signatory cigarette manufacturers to seize market share because of the competitive advantage accruing from not contributing to the settlement. It declares that the agreement "effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers experience vis-a-vis Non-Participating Manufacturers with such Settling States as a result of the provisions of this Agreement." MSA IX(d)(2)(E).

It is these barriers to entry and increased production that plaintiffs claim form an output cartel that violates the antitrust laws. Because output is restricted and because of the inelastic demand for cigarettes, in part due to their addictive nature, the Multistate Settlement Agreement allegedly permitted the Majors to raise their prices to near monopoly levels Ä levels allegedly above those necessary to fund the settlement payments. For example, assert plaintiffs, the settlement could have been funded by only a $.19/pack increase in price, but the Majors immediately raised prices by $.45/pack, and subsequently by another $.31/pack. When this lawsuit was filed, the Majors had already raised the wholesale price of cigarettes $.76/pack since the adoption of the Multistate Settlement Agreement. Rapid price increases of this magnitude would ordinarily permit competitors to maintain or reduce prices or prompt new competitors to enter the market. But neither occurred, assert plaintiffs, because the barriers erected by the Multistate Settlement Agreement effectively barred entry and discouraged tobacco companies from maintaining a lower price because of the penalties for increased production.

Defendants contend the Multistate Settlement Agreement did not violate the antitrust laws, but even if so, they are immune under both the Noerr-Pennington doctrine, which protects petitioning activity, and the Parker doctrine, which protects sovereign acts of states from antitrust liability. We turn first to the antitrust issues.

## II.
## Antitrust Injury

The defendants argue the express terms of the Multistate Settlement Agreement do not constitute an agreement to limit output in violation of the antitrust laws. Plaintiffs

counter that the Multistate Settlement Agreement's Renegade Clause, Qualifying
Statutes, and Enforcement Fund, have the "unequivocal purpose and effect" to
"effectuate a cartel limiting the output of cigarettes, thereby allowing the Majors to
maintain supracompetitive prices," which is a per se violation of the antitrust laws.  Br.
of Appellants at 29.

To maintain a cause of action under the Sherman Act, "[p]laintiffs must prove
antitrust injury, which is to say (1) injury of the type the antitrust laws were intended to
prevent and (2) that flows from that which makes defendants' acts unlawful."  Brunswick
Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489 (1997) (emphasis in original).  The
antitrust injury requirement "ensures that the harm claimed by the plaintiff corresponds to
the rationale for finding a violation of the antitrust laws in the first place, and it prevents
losses that stem from competition from supporting suits by private plaintiffs."  2 Philip E.
Areeda & Herbert Hovenkamp, Antitrust Law   362 (Rev. ed. 1997).

Here, the losses plaintiffs allege resulted from explicit provisions of the Multistate
Settlement Agreement, not from competition.  Plaintiffs allege the major tobacco
companies formed and enforced a cartel to restrict output through the Multistate
Settlement Agreement.  As a result, plaintiffs claim the Majors "imposed artificially high
prices on direct purchasers," without fear of competition.  See Complaint   2.  Although
this result would affect cigarette prices for retailers and consumers, as well as for
wholesalers like plaintiffs, the Supreme Court has determined that direct buyers are the
only parties with standing to assert damage claims under the antitrust laws for
overcharges based on an output cartel.  Ill. Brick Co. v. Illinois, 429 U.S. 477, 734
(1977) ("[T]he antitrust laws will be more effectively enforced by concentrating the full
recovery for the overcharge in the direct purchasers rather than by allowing every
plaintiff potentially affected by the overcharge to sue only for the amount it could show
was absorbed by it.").  Although plaintiffs, as wholesalers, have alleged an injury, they
must also demonstrate that the conduct which caused the injuries violated the antitrust
laws.

An agreement which has the purpose and effect of reducing output is illegal under
 1 of the Sherman Act.  Cal. Dental Ass'n v. FTC, 526 U.S. 756, 777 (1999) (output
restrictions are anticompetitive);  Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of
Univ. of Okla., 468 U.S. 85, 99 (1984) (where "the challenged practices create a
limitation on output; our cases have held that such limitations are unreasonable restraints
of trade") (citing United States v. Topco Assocs., Inc., 405 U.S. 596, 608-09 (1972));
United States v. Sacony Vacuum Oil Co., 310 U.S. 150, 223 (1940).  In California
Dental, the Court restated that output restrictions are anticompetitive.  At the same time,
it refused to apply a "quick look analysis" where a local professional association had
restricted certain types of advertising, but it was not obvious that the restrictions would
be anticompetitive.  Remanding for further analysis, the Court acknowledged that a
reduction in output was an antitrust violation.  Cal. Dental Ass'n, 526 U.S. at 777, 781.
The Court cited with approval a case from the Court of Appeals of the Seventh Circuit
which held that if  "'firms restrict output directly, price will rise in order to limit demand
to the reduced supply.  Thus, with exceptions not relevant here, raising price, reducing
output, and dividing markets have the same anticompetitive effects.'" Id. at 777 (quoting
General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n, 744 F.2d 588, 594-95 (7th Cir.
1984)).  The Court has made clear that a pure restriction on output is anticompetitive and
in the absence of special circumstances, would violate the antitrust laws. NCAA, 486
U.S. at 85 (recognizing that output restrictions may be permissible if required in order to
market the product at all).  By limiting production, the cartel is able to raise prices above
competitive levels.
    Federal Trade Commission/Department of Justice Guidelines also recognize that
agreements to reduce output violate the antitrust laws.  See FTC/DOJ Guidelines
 Antitrust Guidelines for Collaborations Among Competitors,   3.2, reprinted in 4 Trade
Reg. Rep. (CCH)   20 (2000) (citing Broadcast Music Inc. v. Columbia Broad. Sys., 441
U.S. 1, 19-20 (1979)).  These regulations define output agreements as "hard core cartel

agreements" and violators are prosecuted criminally without regard to "claimed business purposes, anticompetitive harms, procompetitive benefits, or overall competitive effects." Id.

Plaintiffs allege the agreement between the States and the Majors purposefully creates powerful disincentives to increase cigarette production. Although the Multistate Settlement Agreement contains no explicit agreement to raise prices or restrict market share, any signatory who increases production beyond historic levels automatically will increase its proportionate share of payments to the Multistate Settlement Agreement. Normally, a company which lowers prices would be expected to increase market share. But the penalty of higher settlement payments for increased market share would discourage reducing prices here. For this reason, signatories have an incentive to raise prices to match increases by competitors. It appears this incentive structure has proven true. The Majors' prices increased dramatically and simultaneously after signing the Multistate Settlement Agreement. As noted, this included a $.45/pack increase just days after the settlement was announced, an $.18/pack increase less than a year later, and a $.13/pack increase in January of 2000. The initial $.45 increase alone was more than double what some analysts considered necessary to fund the settlement's first two annual payments. See Stuart Taylor Jr., All for Tobacco and Tobacco for All, 23 Legal Times 40, Oct. 9, 2000.

Defendants contend an antitrust analysis is unnecessary if we find either Noerr–Pennington or Parker immunity applies. But plaintiffs argue that immunity cannot attach to per se antitrust violations. We disagree. Recently we recognized immunity attached even where the plaintiff alleged a boycott regarded as illegal per se. Armstrong Surgical Ctr. Inc., v. Armstrong Mem'l Hosp., 185 F.3d 154, 157–58 (3d Cir. 1999) (applying Parker and Noerr–Pennington immunity where complaint alleged a threat of a boycott which would have constituted an antitrust violation in the absence of immunity), cert. denied, 530 U.S. 1261 (2000). Similarly, in Pennington, the alleged conduct granted immunity would have been a per se violation of the antitrust laws. United Mine Workers

v. Pennington, 381 U.S. 657, 660–61 (1965).

Our review at this stage is limited to the allegations in plaintiffs' complaint. On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the issue is whether plaintiffs have properly pleaded an antitrust violation. Plaintiffs allege that defendants formed an output cartel through the Multistate Settlement Agreement that restricts production and effectively bars entry to the cigarette tobacco market. Plaintiffs also allege the cartel injured the tobacco wholesalers by charging artificially high prices.

We hold that plaintiffs have properly pleaded an antitrust violation by alleging defendants agreed to form an output cartel through the Multistate Settlement Agreement that violates 1 and 2 of the Sherman Antitrust Act. But we will affirm if the parties to the Multistate Settlement Agreement are immune under the Noerr–Pennington or the Parker doctrines. We turn now to that question.

### III.
### Antitrust Immunity

Defendants contend they are immune from antitrust liability under both the Noerr–Pennington doctrine, which immunizes parties involved in petitioning the government, and under the Parker doctrine, which immunizes sovereign state action. Although distinct doctrines, there is substantial overlap as both "work at the intersection of antitrust and governance." The two doctrines share a fundamental similarity. The Supreme Court has stated they are "complementary expressions of the principle that the antitrust laws regulate business, not politics; Parker protects the States' acts of governing, and Noerr the citizens' participation in government." City of Columbia v. Omni Outdoor Adver. Inc., 499 U.S. 365, 383 (1991). The District Court found defendants immune under both. We must affirm if defendants are immune under either doctrine.

A. Noerr–Pennington Immunity

Under the Noerr-Pennington doctrine, "[a] party who petitions the government for redress generally is immune from antitrust liability." Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 122 (3d Cir.), cert. denied, 528 U.S. 871 (1999). Petitioning is immune from liability even if there is an improper purpose or motive. See E. R.R.

Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 138 (1961) (holding
that even if the petitioner's sole purpose was to destroy its competition through passage
of legislation, petitioner would be immune); Prof'l Real Estate Investors, Inc. v.
Columbia Pictures Indus., Inc., 508 U.S. 49, 56 (1993) (same).  Rooted in the First
Amendment and fears about the threat of liability chilling political speech, the doctrine
was first recognized in two Supreme Court cases holding federal antitrust laws
inapplicable to private parties who attempted to influence government action – even
where the petitioning had anticompetitive effects.  See Noerr, 365 U.S. 127; United Mine
Workers v. Pennington, 381 U.S. 657 (1965).  Under the Noerr-Pennington doctrine,
"mere attempts to influence the Legislative Branch for the passage of laws or the
Executive Branch for their enforcement" are given immunity from the Sherman Act and
other antitrust laws.  Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510
(1972).  The immunity reaches not only to petitioning the legislative and executive
branches of government, but "the right to petition extends to all departments of the
Government," including the judiciary.  Id.

     Noerr-Pennington immunity applies to actions which might otherwise violate the
Sherman Act because "[t]he federal antitrust laws do not regulate the conduct of private
individuals in seeking anticompetitive action from the government." Omni, 499 U.S. at
379-80.  The antitrust laws are designed for the business world and "are not at all
appropriate for application in the political arena."  Noerr, 365 U.S. at 141.  This was
evident in Noerr, where defendant railroads campaigned for legislation intended to ruin
the trucking industry.  Even though defendants employed deceptive and unethical means,
the Supreme Court held that they were still immune.  This is because the Sherman Act is
designed to control "business activity" and not "political activity."  Id. at 129.  With this
underpinning, the Court stated, "[Because] [t]he right of petition is one of the freedoms
protected by the Bill of Rights, . . . we cannot, of course, lightly impute to Congress an
intent to invade these freedoms."  Noerr, 365 U.S. at 136.  The antitrust laws were

enacted to regulate private business and do not abrogate the right to petition.

The scope of Noerr-Pennington immunity, however, depends on the "source, context, and nature of the competitive restraint at issue."  Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 499 (1988).  If the restraint directly results from private action there is no immunity.  See id. at 500 (where the "restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action," there is immunity).  Passive government approval is insufficient.  Private parties cannot immunize an anticompetitive agreement merely by subsequently requesting legislative approval.

Under the Noerr-Pennington doctrine, private parties may be immunized against liability stemming from antitrust injuries flowing from valid petitioning.  This includes two distinct types of actions.  A petitioner may be immune from the antitrust injuries which result from the petitioning itself.  See Noerr, 365 U.S. at 143 (finding trucking industry plaintiffs' relationships with their customers and the public were hurt by the railroads' petitioning activities, yet the railroads were immune from liability).  Also, and particularly relevant here, parties are immune from liability arising from the antitrust injuries caused by government action which results from the petitioning.  See Pennington, 381 U.S. at 671 (holding plaintiffs could not recover damages resulting from the state's actions); Mass. Sch. of Law at Andover, Inc. v. Am. Bar Assoc., 107 F.3d 1026, 1037 (3d Cir. 1997) (holding Noerr gave immunity for any damages stemming from state adoption of requirements for bar admission to petitioners who lobbied for their adoption); 1 Areeda & Hovenkamp, supra, at  202c.  Therefore, if its conduct constitutes valid petitioning, the petitioner is immune from antitrust liability whether or not the injuries are caused by the act of petitioning or are caused by government action which results from the petitioning.  Here, we must determine whether a settlement agreement between private parties and sovereign states fits within the context of protected petitioning envisioned by the Noerr-Pennington doctrine.

Finding that negotiating the settlement was akin to petitioning the government, the

District Court held defendants immune under Noerr-Pennington. Specifically, it held that the "concerted effort by defendants to influence public officials, i.e., the states' Attorneys General, to accept a settlement in exchange for dismissing the numerous lawsuits pending against defendants is among the activities protected by the Noerr-Pennington doctrine." A.D. Bedell, 104 F.Supp.2d at 506. We agree that defendants engaged in petitioning activity with sovereign states and are immune under the Noerr-Pennington doctrine.

1.

The importance of the right to petition has been long recognized. As early as 1215, the Magna Carta granted barons the right to petition the King of England for redress. See Julie M. Spanbauer, The First Amendment Right to Petition Government for a Redress of Grievances: Cut From a Different Cloth, 21 Hastings Const. L.Q. 15, 17 (1993) (detailing history of the right to petition from 1215 through colonial times, the constitutional convention, and today). During our colonial period, the right to petition was widely used. The importance of this right was fundamental – it guaranteed not merely expression but the preservation of democracy. "The very idea of government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." United States v. Cruikshank, 92 U.S. 542, 552 (1875).

Because of the importance of the right to petition the government freely, and because "[a]ntitrust law was . . . not intended to impose a barrier between the people and their government," Noerr-Pennington immunity extends beyond filing formal grievances directly with the government. Balt. Scrap Corp. v. David J. Joseph Co., 237 F.3d 394, 398 (4th Cir. 2001) (holding secret funding of a lawsuit brought against a potential competitor to maintain a monopoly was protected under Noerr-Pennington, even though the funding party was not a litigant).

In a recent survey of the application of Noerr-Pennington immunity to non-traditional petitioning, Primetime 24-Joint Venture v. Nat'l Broad. Co., Inc., 219 F.3d 92, 99-100 (2d Cir. 2000), the Court of Appeals for the Second Circuit noted the

Supreme Court has extended Noerr immunity to actions before administrative agencies
and the courts, Cal. Motor Transp., 404 U.S. at 508, 510-11, and that other courts have
extended Noerr-Pennington immunity to include efforts to influence governmental action
incidental to litigation such as prelitigation threat letters.  McGuire Oil Co. v. Mapco.,
Inc., 958 F.2d 1552, 1560 (11th Cir. 1992); Coastal States Mktg., Inc. v. Hunt, 694 F.2d
1358, 1367-68 (5th Cir. 1982).  There would seem to be no reason to differentiate
settlement from other acts associated with litigation.  See Columbia Pictures Indus., Inc.
v. Prof'l Real Estates Investors, Inc., 944 F.2d 1525, 1528-29 (9th Cir. 1991), aff'd, 508
U.S. 49 (1993) (affirming, but not addressing whether settlement creates immunity
because sham exception defeated immunity).  The Court of Appeals for the Seventh
Circuit has recognized the application of Noerr-Pennington immunity to settlements
between private parties and state government.  In Campbell v. City of Chicago, 823 F.2d
1182, 1186 (7th Cir. 1987), two cab companies were found immune from antitrust
liability for their agreement to settle their lawsuits against the city in exchange for the
passage of a favorable and arguably anticompetitive ordinance.  The settlement in
Campbell resonates favorably with the Multistate Settlement Agreement here.

       The Supreme Court has yet to speak definitively on extending petitioning
immunity to settlement agreements with sovereign states.  Relying on a statement in
Broadcast Music, Inc. v. Columbia Broadcasting Systems Inc., plaintiffs claim the
Supreme Court refused to extend immunity to settlement agreements when it stated that a
"consent judgment, even one entered at the behest of the Antitrust Division, does not
immunize the defendant from liability for actions, including those contemplated by the
decree, that violates the rights of nonparties."  441 U.S. 1, 13 (1979).  "But in any event,
[we are] bound by holdings, not language."  Alexander v. Sandoval, 2001 WL 408983
(U.S.). We believe this case is easily distinguished.  There was no settlement agreement
in Broadcast Music.  Rather, Broadcast Music involved actions taken years after the
resolution of a claim by private actors who claimed they were acting under the protection

of a consent decree.  The Supreme Court ruled that the consent decree did not immunize the anticompetitive actions taken by private parties.  For the above quoted language, Broadcast Music relied upon Sam Fox Publishing Co. v. United States, 366 U.S. 683, 689 (1961), which did not involve Noerr–Pennington immunity.  Sam Fox addressed whether a non-participant is bound by the outcome of government antitrust litigation.  Id.  Neither Broadcast Music nor Sam Fox mentioned Noerr–Pennington immunity, and neither is applicable to the facts here.

Plaintiffs claim a motivating purpose behind the Multistate Settlement Agreement was to create a cartel guaranteeing tobacco companies supracompetitive profits.  Br. of Appellants at 49.  Similarly, plaintiffs claim the States were motivated by a desire to share in these revenues.  But the parties' motives are generally irrelevant and carry no legal significance.  See Noerr, 365 U.S. at 138.  At the same time, it bears noting that the petitioning here invoked the States' traditional powers to regulate the health and welfare of its citizens.  See, e.g., Great Atlantic and Pac. Tea Co., Inc. v. Hugh B. Cottrell, 424 U.S. 366, 370 (1976) ("[U]nder our constitutional scheme the States retain 'broad power' to legislate protection for their citizens in matters of local concern such as public health.").

In sum, we see no reason to distinguish between settlement agreements and other aspects of litigation between private actors and the government which give rise to antitrust immunity.  The rationale is identical.  Freedom from the threat of antitrust liability should apply to settlement agreements as it does to other more traditional petitioning activities.  We hold the defendants are immune under the Noerr–Pennington doctrine.

B.  Parker Immunity

Having found the defendants immune under Noerr–Pennington, our analysis could end here.  But the District Court found Parker immunity, so we will address it as well.

Antitrust laws do not bar anticompetitive restraints that sovereign states impose "as an act of government."  Parker v. Brown, 317 U.S. 341, 352 (1943); see also Mass. Sch. of Law at Andover, Inc. v. Am. Bar Assoc., 107 F.3d 1026, 1035 (3d Cir. 1997).

The Parker doctrine relies heavily on the clarity of the State's goals and actions.
"[S]tates must accept political responsibility for the actions they intend to undertake."
FTC v. Ticor Title Ins. Co., 504 U.S. 621, 636 (1992).  The key question is whether the
allegedly anticompetitive restraint may be considered the product of sovereign state
action.  If it is not, then even if sectors of state government are involved, the activity will
not constitute "state action" under the Parker doctrine and will not receive immunity.

"State action," as defined in cases granting Parker immunity, is qualitatively
different from "state action" in other contexts such as the Fourteenth Amendment.  See 1
Areeda & Hovenkamp, supra, at    221.  While the Fourteenth Amendment can cover

> inadvertent or unilateral acts of state officials not acting
> pursuant to state policy . . . the term "state action" in antitrust
> adjudication refers only to government policies that are
> articulated with sufficient clarity that it can be said that these
> are in fact the state's policies, and not simply happenstance,
> mistakes, or acts reflecting the discretion of individual
> officials.

Id.  Because it is grounded in federalism and respect for state sovereignty, this interest in
protecting the acts of the sovereign state, even if anticompetitive, outweighs the
importance of a freely competitive marketplace, especially in the absence of contrary
congressional intent.

Without clear congressional intent to preempt, federal laws should not invalidate
state programs.  "In a dual system of government in which, under the Constitution, the
states are sovereign, save only as Congress may constitutionally subtract from their
authority, an unexpressed purpose to nullify a state's control over its officers and agents
is not lightly to be attributed to Congress."  Parker v. Brown, 317 U.S. 341, 351 (1943).
While individual anticompetitive acts of state governments may be considered unwise or
counterproductive, the decision to make such choices lies within the sovereign power of
the states.  Congress did not intend to override important state interests in passing the
Sherman Act.  "The general language of the Sherman Act should not be interpreted to

prohibit anticompetitive actions by the States in their governmental capacities as sovereign regulators." City of Columbia v. Omni Outdoor Adver., 499 U.S. 365, 374 (1991).

The Sherman Act was enacted to address the unlawful combination of private businesses. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 493 n.15 (1940) ("The history of the Sherman Act as contained in the legislative proceedings is emphatic in its support for the conclusion that 'business competition' was the problem considered and that the act was designed to prevent restraints of trade which had a significant effect on such competition."). "There is no suggestion of a purpose to restrain state action in the Act's legislative history." Parker, 317 U.S. at 313. The Sherman Act was passed "in the era of 'trusts' and of 'combinations' of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern." Apex, 310 U.S. at 493. Given its focus on the problems of private monopolies and combinations, it is not surprising that the Sherman Act does not set out to curb clearly defined anticompetitive state actions. See Cal. Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc., 445 U.S. 97, 104 (1980).

When a state clearly acts in its sovereign capacity it avoids the constraints of the Sherman Act and may act anticompetitively to further other policy goals. See S. Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 54 (1985). For example, state governments frequently sanction monopolies to ensure consistent provision of essential services like electric power, gas, cable television, or local telephone service. But "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." Parker, 317 U.S. at 351 (states cannot authorize private parties to set a price and then enforce those prices without any evaluation of their reasonableness). Only an affirmative decision by the state itself, acting in its sovereign capacity, and with active supervision, can immunize otherwise anticompetitive activity.

When it is uncertain whether an act should be treated as state action for the purposes of Parker immunity, we apply the test set forth in California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97, 104 (1980), to "determine whether anticompetitive conduct engaged in by private parties should be deemed state action and thus shielded from the antitrust laws." Patrick v. Burget, 486 U.S. 94, 100 (1988). Applying Midcal is unnecessary if the alleged antitrust injury was the direct result of a clear sovereign state act. Mass. Sch. of Law at Andover v. Am. Bar Assoc., 107 F.3d 1026, 1036 (3d Cir. 1997); Session Tank Liners, Inc. v. Joor Mfg., Inc., 17 F.3d 295, 299 (9th Cir. 1994) (finding immunity from antitrust liability where "injuries for which [the plaintiff] seeks recovery flowed directly from government action"). In Massachusetts School of Law, we held that where "the states are sovereign in imposing the bar admission requirements [the alleged anticompetitive restraints], the clear articulation and active supervision requirements . . . are inapplicable." 107 F.3d at 1036. There is less need for scrutiny "[w]hen the conduct is that of the sovereign itself . . . [because] the danger of unauthorized restraint of trade does not arise." PTI, Inc. v. Philip Morris, Inc., 100 F.Supp.2d 1179, 1196 (C.D. Ca. 2000). Similarly, concerns about the legitimacy of the action are reduced. Thus we must first decide if Midcal applies to the States' actions in negotiating and implementing the Multistate Settlement Agreement.

The Supreme Court has recognized state legislative and judicial action as sovereign under Parker. But "[c]loser analysis is required" when the action is less directly that of the legislature or judiciary. Hoover v. Ronwin, 466 U.S. 558, 568 (1984) (relying in part on Midcal). One Court of Appeals has decided that executive officers and agencies "are entitled to Parker immunity for actions taken pursuant to their constitutional or statutory authority, regardless whether these particular actions or their anticompetitive effects were contemplated by the legislature," without the need for Midcal analysis. Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc., 810 F.2d 869, 876 (9th Cir. 1987). We have yet to address whether the acts of executive officials

constitute state action that avoids Midcal analysis.  Furthermore, in this case, we must
determine whether the antitrust injuries were more attributable to private parties than to
government action, as was the case in Midcal.

   1.  Direct Application of Parker

   An argument can be made that the Multistate Settlement Agreement, and any of its
anticompetitive effects, were the direct result of state government action.  For each
signatory state, there was active involvement by high ranking executive officials and the
agreement was subject to state court approval.  The Multistate Settlement Agreement was
negotiated by Attorneys General from each state to settle existing and contemplated
lawsuits.  The Multistate Settlement Agreement  required that,

> each Settling State that is a party to a lawsuit . . . and each
> Participating Manufacturer will:
>
>    (A) tender this agreement to the Court in such Settling State for its approval; and
>
>    (B) tender to the Court in such Settling state for entry of a consent decree conforming to the model consent decree attached hereto as Exhibit L.

MSA  XIII(b)(1); see also PTI, 100 F.Supp.2d at 1196.


   In most cases, the state legislatures were involved as well.  Although they lacked a
direct role in forming or approving the Multistate Settlement Agreement, the legislatures
were charged with, and responsible for, the enactment of the Qualifying Statutes which,
although technically voluntary, enforce important components of the Multistate
Settlement Agreement.  See MSA  IX(d)(2)(E), (F) and (G).  It is apparent that
legislative enactment of the Qualifying Statutes signified state approval of the Multistate
Settlement Agreement.  See Cal. Aviation Inc. v. City of Santa Monica, 806 F.2d 905,
909 n.5 (9th Cir. 1986) (noting statutes passed afterwards can be evidence of pre-existing
state policy to allow anticompetitive behavior).  In a few states, the legislatures played an
even greater role by applying pressure on the Attorney General or Governor to bring suit
or by passing legislation authorizing the Attorney General to bring suit against the

tobacco companies.  Additionally, each branch of state government had a role in the execution or operation of the Multistate Settlement Agreement.  Under this analysis, one could find direct state action foreclosing the application of Midcal.

Under a different view, we focus not on the negotiation and consummation of the Multistate Settlement Agreement, but on its actual operation and resulting effects, since that is the true cause of the anticompetitive effects.  This is how the Supreme Court analyzed the behavior in Midcal.

In Midcal, the price setting structure that resulted in antitrust injury would not have existed but for the state regulation.  Only because of state legislative enactments did California wine producers hold power over the wholesalers to engage in resale price maintenance.  Midcal, 445 U.S. at 105.  Because the actual parties involved in the anticompetitive behavior were private parties, the Supreme Court determined the alleged violation of the antitrust laws was not obvious state action and devised what has come to be known as the Midcal test.

We have found direct state action, without Midcal analysis, only when the allegedly anticompetitive behavior was the direct result of acts within the traditional sovereign powers of the state.  See Mass. Sch. of Law, 107 F.3d at 1036; see also Zimomra v. Alamo Rent–A–Car, Inc., 111 F.3d 1495, 1500 (10th Cir. 1997).  In Massachusetts School of Law, we held Midcal inapplicable because the state acted as sovereign in imposing bar admission requirements.  107 F.3d at 1036 (Massachusetts School of Law at Andover, Inc., an unaccredited law school, had challenged the state requirement that a student graduate from an ABA accredited law school as an anticompetitive restraint).  We distinguished Midcal and its progeny as "inapplicable because they dealt with situations where private parties were engaging in conduct . . . which led directly to the alleged antitrust injury."  Id.  Similarly, in Zimomra, the Court of Appeals for the Tenth Circuit held Midcal inapplicable in a challenge to rental car price fixing because the city and county, and not a private actor, had the ultimate responsibility for setting rental car daily use fees and the private parties "had no such

discretionary authority." 111 F.3d at 1500. In neither case was a private party responsible for the resulting anticompetitive act; and thus there was no need to apply the Midcal analysis.

Although the Multistate Settlement Agreement was a negotiated settlement by State Attorneys General, and the state legislatures were responsible for passing the Qualifying Statutes to enforce important components of the agreement, these acts by the governmental parties were not the direct source of the anticompetitive injuries. Therefore, it would appear that, just as the injury in Midcal was caused by private parties taking advantage of the state imposed market structure, the anticompetitive injury here resulted from the tobacco companies' conduct after implementation of the Multistate Settlement Agreement, and not from any further positive action by the States. Even though, as defendants argue, the Multistate Settlement Agreement created the cartel, this fact makes the case analogous to Midcal, not different.

The signing of the Multistate Settlement Agreement and the establishment of the output cartel are not purely private actions, nor are they entirely attributable to the state in the manner of a legislative act. As such, this case resembles a "hybrid restraint" as discussed by Justice Stevens in his concurrence in Rice v. Norman Williams Co., 458 U.S. 654, 666–67 (1982) (Stevens, J., concurring). Hybrid restraints are not the type of sovereign state action found in Massachusetts School of Law or Zimomra, that avoid Midcal treatment. Instead, hybrid restraints involve a degree of private action which calls for Midcal analysis. See Rice, 458 U.S. at 666 ("Hybrid restraints of this character require analysis that is different from a public regulatory scheme on the one hand, and a purely private restraint on the other.") (citations omitted) (Stevens, J., concurring). Therefore, to determine if the allegedly anticompetitive sections of the Multistate Settlement Agreement were "state action" under the Parker doctrine, we will apply the Midcal analysis.

For the reasons expressed, namely that the antitrust injuries here were not caused by the solitary acts of the state acting in its traditional capacity, but were instead caused

by hybrid acts involving private parties in the unique setting of a joint settlement, we believe this form of alleged anticompetitive restraint requires the Midcal analysis.

2.  Midcal

To qualify as state action under the Midcal test, "the challenged restraint must be one 'clearly articulated and affirmatively expressed as state policy.'" 445 U.S. at 104 (quoting City of Lafayette v. La. Power & Light Co., 435 U.S. 389, 410 (1978) (opinion of Brennan, J.)).  A government entity need not "be able to point to a specific, detailed, legislative authorization" to assert a successful Parker defense.  Lafayette, 435 U.S. at 415.  But it must be evident that under the "clear articulation" standard the challenged restraint is part of state policy.  As the Supreme Court has stated, "Midcal confirms that while a State may not confer antitrust immunity on private persons by fiat, it may displace competition with active state supervision if the displacement is both intended by the State and implemented in its specific details."  FTC v. Ticor Title Ins. Co., 504 U.S. 621, 633 (1992).

Here, the States' reasons for bringing suits against the Majors Ä to reduce teenage smoking, address public health concerns, and recoup state health care expenditures Ä were evident and clearly articulated.  State Attorneys General and Governors made public pronouncements which received national coverage.  Other suing states made similar announcements and cited to studies demonstrating the enormous impact of cigarette smoking on health and finances.  The proclaimed goals of the States were clear.

As noted, the State Attorneys General and the Governors were not the only state actors involved.  The State Attorneys General took the lead in negotiations, but the state courts played an important role in approving the Multistate Settlement Agreement by issuing consent judgments and dismissing the lawsuits.  This was required by the Multistate Settlement Agreement which provided that each signatory state would "tender to the Court in such Settling State for entry of a consent decree conforming to the model consent decree" included in the agreement.  See MSA  XIII(b)(1).  The lawsuits were

dismissed under the consent agreements.  The state legislatures also demonstrated their approval in most of the States by passing implementing legislation.  See Cal. Aviation Inc., 806 F.2d at 909 n.5 (noting that statutes passed afterwards are evidence of pre-existing state policy to allow anticompetitive behavior).  Even before the settlement, legislatures of some states targeted the tobacco industry by putting pressure on the Attorney General or Governor to bring suit.  In view of public pronouncements of the States' intentions and goals, along with active involvement from each branch of state government, it is evident the Multistate Settlement Agreement was backed by clearly articulated state policy.

The second prong of the Midcal test is whether the resulting antitrust violation was "actively supervised" by the state.  This standard is more problematic.  The essential inquiry of the "actively supervised" prong is to determine if the "anticompetitive scheme is the State's own."  FTC v. Ticor Title Ins. Co., 504 U.S. 621, 635 (1992).  The active supervision prong "requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy."  Patrick v. Burget, 486 U.S. 94, 101 (1988).  "Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests."  Id. at 100-01.  "Such active state review is clearly necessary where private defendants are empowered with some type of discretionary authority in connection with the anticompetitive acts (e.g. to determine price or rate structures)."  Zimomra, 111 F.3d at 1500.  Rubber stamp approval of private action does not constitute state action.  A state must independently review and approve the anticompetitive behavior to satisfy this prong of the Parker doctrine.  Patrick, 486 U.S. at 101 ("The active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct."); Ticor, 998 F.2d at 1139.

Here, plaintiffs allege the Multistate Settlement Agreement primarily furthers the private tobacco companies' interests and not those of the States.  While we do not agree

with this characterization, it is clear the Multistate Settlement Agreement empowers the tobacco companies to make anticompetitive decisions with no regulatory oversight by the States.  Specifically, the defendants are free to fix and raise prices, allegedly without fear of competition.  The question then is whether the Multistate Settlement Agreement, with all its duties and responsibilities, creates sufficient state supervision even though the pricing decisions are unregulated.

The States actively and continually monitor the implementation of portions of the Multistate Settlement Agreement.  See MSA   VII–VIII.  After requiring a state court consent decree, the Multistate Settlement Agreement also mandates state courts to maintain continuing jurisdiction over enforcement of disputes between the States and the tobacco companies.  See MSA   VII(a).  Under the Multistate Settlement Agreement, the state courts may order compliance in the form of an Enforcement Order.  See MSA VII(c)(3).  If a State Attorney General believes a manufacturer has failed to comply with an Enforcement Order, it may seek an order for civil contempt or monetary sanction to force compliance.  See MSA   VII(c)(4).  Furthermore, for a period of seven years after settlement, the Attorney General of a Settling State may inspect all non-privileged records of the tobacco companies, and will have access to interview directors, officers and employees upon reasonable belief of a violation of the Multistate Settlement Agreement.  See MSA   VII(g).

The Multistate Settlement Agreement also establishes a $50 million fund to assist the States in enforcing the Multistate Settlement Agreement.  See MSA VIII(c).  This fund is to be used

> to supplement the States'
>
> (1) enforcement and implementation of the terms of [the Multistate Settlement Agreement] and consent decrees, and
>
> (2) investigation and litigation of potential violations of laws with respect to Tobacco Products.

Id.

This includes prosecution of non-signatories for those underlying "torts" which initially

led the States to sue the major tobacco companies.

The largest responsibilities for the tobacco companies are financial. The Multistate Settlement Agreement details how and when the payments will be made to the settling states each year. See MSA IX. In addition, there is a limited "most-favored nation" provision. In the event a State settles with a non-signatory tobacco company (NPM) on terms more favorable than the Multistate Settlement Agreement (a lower payment-per-pack amount), then all signatories will be entitled to a revision of the Multistate Settlement Agreement to at least match the new agreement. See MSA XVIII(b)(2). There are also significant ongoing restrictions placed on the tobacco manufacturers. They are prohibited from taking "any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion, or marketing of Tobacco Products," MSA III(a); they also agreed to refrain from using "any cartoon in the advertising, promoting, packaging or labeling of Tobacco products." MSA III(b).

Despite these factors, we are not convinced that the States satisfy Midcal's "active supervision" prong. This is because the States' supervision does not reach the parts of the Multistate Settlement Agreement that are the source of the antitrust injury. It is the conduct that violates the antitrust laws that states must "actively supervise" in order for Parker immunity to attach.

As we recognized in Norman's on the Waterfront, Inc. v. Wheatley, "an arrangement sponsored by the state is not necessarily state action for the purposes of the antitrust laws." 444 F.2d 1011, 1017 (3d Cir. 1971) (citing Woods Exploration & Producing Co., Inc. v. Aluminum Co. of Am., 438 F.2d 1286, 1294 (5th Cir. 1971) for the proposition that "it is not every governmental act that points a path to an antitrust shelter"). In Wheatley, we analyzed a series of Parker cases demonstrating the state must be actively involved in establishing the rules of the market as well as in the anticompetitive activity. Because "'states can neither authorize individuals to perform acts which violate the antitrust laws nor declare that such action is lawful,'" many of these cases of hybrid restraints turn on whether the state remains involved in the actual

pricing by the regulated parties. Wheately, 444 F.2d at 1017 (quoting Asheville Tobacco Bd. of Trade, Inc. v. Fed. Trade Comm'n, 263 F.2d 502, 509 (4th Cir. 1959)).

Significantly, in Midcal, the State of California enacted a pricing system for the wine industry. Because the State did not exercise direct control over the resulting prices set by the private actors, and did not review the reasonableness of the prices, the Supreme Court found insufficient "active supervision" to qualify as state action. Midcal, 445 U.S. at 105-06. Therefore, there was no immunity for setting anticompetitive prices under this system. Id.

In Midcal, the challenged "restraints" were state statutes on pricing and resale price maintenance. But there were several other ways in which the State of California regulated the wine industry. See, e.g., Cal. Bus & Prof. Stat. Ann. 25600-67 (West 1964). California actively supervised when, where, and to whom wine or other alcoholic beverages could be sold, the markings and signs on labels, penalties for underage use, and advertisements, including prohibiting advertising to minors. This "supervision" was not cited in Midcal because it did not constitute part of the anticompetitive restraint at issue. Under Parker, a comprehensive regulatory scheme would be immune from antitrust liability because the "State would 'displace unfettered business freedom' with its own power," Midcal, 445 U.S. at 106. But the Supreme Court in Midcal was silent about the impact of other regulatory provisions in the California Code denoting, we believe, the absence of a comprehensive regulatory scheme in this sense.

Since Midcal, other courts have found that if a state creates or sanctions a monopoly or cartel through its sovereign powers, but does not regulate the resulting prices, the resulting anticompetitive behavior should not be granted immunity. In Wheately, we held that because the Virgin Islands Alcoholic Beverages Fair Trade Law did not grant the power to "approve, disapprove, or modify the prices fixed by private persons," the program could not meet the active supervision prong of Midcal and was not immune under Parker. In Asheville Tobacco, the Court of Appeals for the Fourth Circuit

held that where a state statute authorized the creation of local tobacco boards to regulate tobacco sales at auctions, and where the states did not continue to supervise the decisions of these boards, the board's actions were not protected by Parker immunity.  This principle has also been applied in state granted monopoly cases.  In Gas Light Co. of Columbus v. Georgia Power Co., 440 F.2d 1135 (5th Cir. 1971), the Court of Appeals for the Fifth Circuit found a utility which had been given a monopoly by the state was entitled to Parker immunity only because its prices were regulated extensively by the state through a process of full adversarial hearings.

In each of these cases, the decision by the state to allow, or even to create, an anticompetitive scheme did not establish immunity.  As a leading antitrust treatise has recognized, "A state may be free to determine for itself how much competition is desirable, provided that it substitutes adequate control wherever it has substantially weakened competition." Areeda & Hovenkamp, supra, at  221 (citing Wheatley, Asheville Tobacco, and Georgia Power).  Under this jurisprudence, only when the state approves and actively supervises the results of the anticompetitive scheme does Parker immunity attach.

As noted, some provisions of the Multistate Settlement Agreement actively regulate the tobacco companies, like those imposing advertising restrictions.  But these provisions have no effect on pricing or production and thus do not regulate the challenged anticompetitive conduct.  Patrick, 486 U.S. at 101.  In contrast, the anticompetitive restraints in the Multistate Settlement Agreement that permit the tobacco companies to maintain an output cartel are the Renegade Clause and, arguably, the resulting Qualifying Statutes.

The States here are actively involved in the maintenance of the scheme, but they lack oversight or authority over the tobacco manufacturers' prices and production levels. These decisions are left entirely to the private actors.  Nothing in the Multistate Settlement Agreement or its Qualifying Statutes gives the States authority to object if the tobacco companies raise their prices.  In fact, it appears these increases have already

happened.  As noted, the Majors have raised their prices sharply and uniformly since the implementation of the Multistate Settlement Agreement  Ä according to plaintiffs, by 50% since 1997.  See Complaint at   36.  These price increases have not been monitored or regulated by the States.  The Multistate Settlement Agreement imposes no restrictions on pricing or provisions to temper the effects of the output cartel.  Under this set of facts, there is insufficient evidence of active supervision of the allegedly anticompetitive restraints to satisfy this prong of Midcal.

Although the Multistate Settlement Agreement is the product of a "clearly articulated" state policy, because the States do not "actively supervise" the anticompetitive restraints, the participants are not entitled to Parker immunity.

3.

The question of Parker immunity's applicability is a difficult one. As noted, we hold we must apply the Midcal test. Although the States satisfy Midcal's "clear articulation" prong, they fail the second prong requiring them to actively supervise the anticompetitive restraints causing injury. Because private participants in state action enjoy Parker immunity only to the extent the States enjoy immunity, the defendants are not shielded by Parker. Therefore, consistent with the Supreme Court's treatment of hybrid restraints, we hold defendants are not immune under the Parker immunity doctrine.

IV.

Constitutional Claims

In its brief, and again at oral argument, plaintiffs asked us to find the Multistate Settlement Agreement unconstitutional under the Commerce Clause or the Compact Clause of the United States Constitution. But plaintiffs did not allege constitutional violations in their amended complaint, nor did the District Court address them. Therefore, these claims will not be addressed on appeal. Mahone v. Addicks Utility Dist., 836 F.2d 921, 935 (5th Cir. 1988) ("It is black-letter law that '[a] motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is to be evaluated only on the pleadings.'") (quoting O'Quinn v. Manuel, 773 F.2d 605, 608 (5th Cir.1985)); N.A.M.I. v. Essex County Bd. of Freeholders, 91 F.Supp.2d 781, 787 n.7 (D.N.J. 2000) ("This Court need not consider claims that have not been pleaded in the complaint."); 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure 1356 (1990). "'Absent exceptional circumstances, an issue not raised in the district court will not be heard on appeal.'" Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 671 (3d Cir. 1999) (quoting Altman v. Altman, 653 F.2d 755, 758 (3d Cir.1981)). When exceptional circumstances exist or to avoid "manifest injustice," issues not previously raised may be heard to protect the public interest. See id. No such interests are present. Although the Cato Institute, amicus curiae for plaintiffs, argues the constitutional claims, "new issues raised by an amicus are not properly before

the court" in the absence of exceptional circumstances.  General Eng'g
Corp. v. Virgin
Islands Water and Power Auth. Caribbean Energy Co., Inc., 805 F.2d 88, 92
(3d Cir.
1986) (citing United Parcel Serv. v. Mitchell, 451 U.S. 56, 60 n.2
(1981)).  These
constitutional claims are not properly before us.

## V.
## Conclusion

The Multistate Settlement Agreement creates novel issues because of
the
uniqueness of the instrument Ä involving forty-six states and over 98% of
an industry.
Although plaintiffs have properly pleaded an antitrust injury, the right
to petition the
government is paramount.  Therefore, we hold defendants immune from
antitrust liability
under the Noerr-Pennington doctrine.  But we find no immunity under the
Parker
doctrine.  We will not address the constitutional issues.

We will affirm the judgment of the District Court.

TO THE CLERK:

      Please file the foregoing opinion.


               /s/ Anthony J. Scirica
                Circuit Judge